**Ruth CULVER, et al., Plaintiffs-Appellants Cross-Appellees,**

v.

**SLATER BOAT CO., et al., Defendants-Appellees Cross Appellants,**

**EUROPIRATES INTERNATIONAL, INC., et al., Defendants-Appellees and Cross-Appellees-Appellants,**

v.

**ODECO DRILLING, et al., Defendants-Appellees Cross Appellants.**

**No. 79–3985.**

United States Court of Appeals, Fifth Circuit.*

Sept. 22, 1982.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

W. James Kronzer, W. W. Watkins, Houston, Tex., Frederick J. Gisevius, Jane M. Gisevius, New Orleans, La., for Ruth Culver et al.

Leonard Fuhrer, Alexandria, La., for amicus curiae Louis Ober.

Patrick A. Juneau, Jr., Lafayette, La., for amicus curiae Penrod Drilling.

Richmond M. Eustis, New Orleans, La., for Slater Enterprises, Europirates, Etc.

Drury, Lozes & Curry, Felicien P. Lozes, New Orleans, La., for Gulf Overseas Ser. Corp.

J. Walter Ward, New Orleans, La., for Ocean Drilling.

Mat M. Gray, III, New Orleans, La., for St. Paul Fire.

## ON REHEARING EN BANC

Before GODBOLD, Chief Judge, BROWN, CHARLES CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON, THOMAS A. CLARK and WILLIAMS, Circuit Judges.**

JOHN R. BROWN, Circuit Judge:

This case comes before us on rehearing en banc to consider whether the holding of this Court in *Johnson v. Penrod Drilling Co.,* 510 F.2d 234 (5th Cir. 1975) (en banc), that neither proof, nor argument, nor jury instructions concerning inflationary factors may be considered or used in maritime, Jones Act, and FELA personal injury and wrongful death actions, should be overruled.[1] After careful consideration of this singular issue, we overrule *Penrod* and remand this case to the District Court.

### I.

### *Bound by Penrod*

The facts leading up to this appeal have already been outlined by this Court in the panel's opinion, 644 F.2d 460, 462–63 (5th Cir. 1981). Briefly, Curtis Culver was killed while working on a vessel owned by Slater Boat Company. The vessel upon which the accident took place was engaged in moving the drilling barge OCEAN QUEEN from its location on the Outer Continental Shelf to a new location. The fatal injury occurred before the barge was actually moved. Culver's widow and children brought suit under the Jones Act, 46 U.S.C. § 688, the Death on the High Seas Act (DOHSA), 46 U.S.C. § 761 *et seq.,* and the general maritime tort and negligence theory. The jury found negligence on the part of Gulf Over-

seas Marine Corporation (Culver's employer), Euro-Pirates International (the charterer of the vessel), and Ocean Drilling & Exploration Company (the owner of a barge involved in the fatality), and no contributory negligence on the part of Culver.

On the issue of damages, the District Court allowed testimony concerning discount rates and the earning power of money invested in low risk bonds. The jury was instructed to "discount the total amount" of any award by a percentage that represented an appropriate rate of interest. In answer to the special interrogatory submitted asking what discount percentage rate was applicable, the jury filled in "25%". The trial judge, on the basis that the jury obviously misunderstood the interrogatory, substituted 9.125%, the only other rate put into evidence by the defendant. In accordance with *Penrod,* the District Court did not allow testimony, charges, or interrogatories to be submitted on the effects of inflation on probable loss of future income.

In short, Culver was not permitted to show any likely increase in future earnings due to inflation. But the award was to be discounted by an interest factor reflecting anticipated inflation.

Culver initially appealed the judgment, raising five issues: (i) should *Penrod* be overruled?; (ii) if *Penrod* is not overruled, should evidence of probable non-inflationary future wage increases (e.g. merit raises) be prohibited?; (iii) can a District Court disregard a jury finding regarding the discount rate and apply one based on opinion testimony?; (iv) was the testimony of Culver's adverse witness sufficiently clear that the court could apply that witness' opinion of the discount rate?; and (v) can a District Court enter a final judgment for damages applicable to all beneficiaries in a maritime death action that is incapable of apportion-

---

** Judge Garza participated in the panel opinion and in the en banc hearing but took senior status on July 7, 1982 and is no longer qualified to participate in the en banc decision.

Judges Garwood, Jolly and Higginbotham joined the Court after submission and oral argument but do not choose to participate.

1. Another case involving the same issue, *Byrd v. Heinrich Schmidt Reederei,* 638 F.2d 1300, *on reh'g en banc,* 688 F.2d 324 (5th Cir. 1982), was consolidated with the present case on rehearing en banc. The *Byrd* opinion appears on the pages immediately following this opinion.

ment among the various beneficiaries?[2] Cross-appeals were brought by all of the defendants raising several additional issues.[3]

Oral argument was heard by a panel of this Court, and the District Court judgment was affirmed as slightly modified. Specifically, the panel considered itself bound by *Penrod*'s holding that "the influence on future damages of possible inflation or deflation is too speculative a matter for juridical determination," 644 F.2d at 643, *quoting Penrod,* 510 F.2d at 241. And in accordance with *Byrd v. Reederei,* 638 F.2d 1300

(5th Cir. 1981) (rehearing en banc granted), the panel rejected Culver's argument that the Supreme Court overruled *Penrod* in *Norfolk & Western Railway v. Liepelt,* 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980).[4] Likewise, the panel found no error in the trial judge's refusal to allow Culver to argue likely future wage increases on the basis of merit, because no evidence was offered to show that such an argument was warranted and, in addition, such evidence was "merely an indirect way of putting inflation factors into evidence before the jury [which is] not allowed under *Penrod.*" 644 F.2d at 464.[5]

**2.** Briefly, Culver objected to the special interrogatory, which asked the jury to find the amount that "will fairly and adequately compensate *Mrs. Culver and her children* for their damages," on the ground that it was impossible for the jury to separate the losses suffered by the children from those suffered by Mrs. Culver. Because a wrongful death action in Louisiana is a new cause of action by the survivors, and not a part of the decedent's estate, La. Civ. Code Art. 2315, Culver argued that damages must be apportioned outside the probate courts. This argument raised the issue of whether Louisiana law applied at all, in light of Culver's Jones Act and DOSHA claims. DOHSA, for example, specifically provides for apportionment by the Court. 46 U.S.C. § 762. The defendants argued that a new trial on this issue could be avoided by permitting the District Court or a state court to apportion the award. The panel found that the record contained no evidence on which a jury could have based an apportionment, and that this maritime action was an improper vehicle to apportion the award. 644 F.2d at 465. We need not decide this issue because of our remand for a new trial on damages, at which time the District Judge may properly frame the issue for Culver's various claims. *See* note 6, *infra.*

**3.** The following issues were raised on cross-appeal: (i) was it proper for the District Court to submit a liability question under the DOHSA, 46 U.S.C. § 761, to a jury?; (ii) was there substantial evidence to support the jury verdict against the defendants?; (iii) did the District Court fail to find a right of indemnification among the defendants?; and (iv) was there sufficient evidence to establish William Culver as a child of the decedent?

**4.** In *Liepelt,* the Supreme Court stated that: [F]uture interest rates, and future inflation are ... matters of estimate and prediction. Any one of these issues might provide the basis for protracted expert testimony and debate. But the practical wisdom of the trial

bar and the trial bench has developed effective methods of presenting the essential elements of an expert calculation in the form that is understandable by juries that are increasingly familiar with the complexities of modern life.
444 U.S. at 494, 100 S.Ct. at 758, 62 L.Ed.2d at 694. This Court in *Byrd,* 638 F.2d at 1308, held that *"Liepelt*'s favorable dicta is only that."

**5.** In addition, the panel found no error in the District Court's substitution of 9.125% for 25% as the discount rate to be applied to the jury's award, because Culver did not offer discount rate evidence and the court's adoption of the rate suggested by the defendants' expert was a proper exercise of discretion. 644 F.2d at 464–65. As to apportionment of damages, the panel found this maritime action an improper vehicle to apportion the award, especially since the record contained no evidence on which the jury could have based its apportionment. 644 F.2d at 465. The panel also found sufficient and adequate evidence to support the verdict on liability. The defendants' arguments as to indemnity on the basis of the active/passive negligence theory, was likewise found to be without merit. 644 F.2d at 465–66. Finally, the claim by one defendant for a reduction in the damage award based upon the trial judge's finding of comparative negligence on the part of Culver was found by the panel to be unsupportable and that portion of the judgment was modified. This claim for reduction was based on the finding, in the indemnity phase of the case, that Culver's employer was actively negligent because of the failure of its employee (Culver) to stay in a position of safety. Yet the jury found Culver free from negligence, and the panel held that the jury determination should prevail. 644 F.2d at 465.

Except as to those issues concerning the damages award which will be decided on remand, we adopt all of the panel's findings and conclusions.

Culver filed a petition for panel rehearing,[6] and a separate petition for rehearing en banc, as required by our rules, raising two closely related issues: (i) should *Penrod* be overruled and (ii) does *Penrod* prohibit a trier of fact in this Circuit to receive evidence of non-inflationary factors, such as probable merit raises and productivity increases, in arriving at future losses? This Court, voting for rehearing en banc, determined that the time was ripe for reconsideration of the rule in *Penrod* pertaining to the "inflation factor" in damages awards. Although Culver's brief to this court on rehearing en banc addressed primarily issue (i), whether proof and argument concerning inflationary factors should be permitted in this Circuit, issue (ii) is also involved since automatic exclusion of evidence of probable merit raises has resulted from a misreading of *Penrod.* The defendants argue that *Penrod* should be upheld, and, in addition, contend that Culver waived the right to relief on the inflation issue by failing to make an offer of proof regarding the likelihood of inflation.

### A.

■ ·Briefly, we will address the defendants' claim that Culver waived the right to raise the issue of inflation by his failure to make a formal proffer at trial. The defendants called as a witness an investment banker who specialized in bonds. On cross-examination, Culver's attorney attempted to ask whether people earned more money over the years of their employment due only to productivity. An objection to the question was sustained. After several more questions, all counsel approached the bench where the judge made it clear that the type of evidence excluded by *Penrod* would not be permitted in court. The jury was then

temporarily excused, and Culver's attorney told the judge that he wanted to ask the expert whether the principal of a bond would be worth less in the future. The trial judge replied that deflation was as likely as inflation, and any testimony as to such factors would be pure speculation. The judge concluded that "I will not permit you to introduce any evidence before the jury relative to inflation in view of the present law that I am bound by which is the *Penrod* case." Before closing argument, and before the jury returned, the judge explained that:

> Plaintiff's counsel will not be permitted to argue that the jury should take into consideration inflation, nor will it be permitted to make an indirect argument which would achieve the same purpose of permitting him to argue inflation by attempting to indicate that it could be expected that plaintiff would receive job promotions or merit increases.

Again, the judge mentioned the prohibitions of *Penrod.* Given this flat prohibition against introducing testimony (or making argument) as to future inflationary trends on the basis of *Penrod,* it makes no sense to argue that Culver may not raise this issue on appeal simply because he did not proffer an expert on inflation. Reading the trial transcript, it is obvious that a record was being created to challenge or at least find an exception to *Penrod.* We find that the matter was sufficiently presented to the judge at trial and that all parties understood the dilemma—Culver wanted the jury to consider inflation, and *Penrod* stood in the way.

### B.

The most problematic issue on this appeal remains: Should *Penrod* be overruled so as

**6.** The petition for panel rehearing asserted three errors: (i) it was improper for the trial judge to adopt the opinion testimony of the defendants' witness as a basis for discounting the jury award, (ii) it was statutorily necessary that the awards be apportioned by the trier of fact, and (iii) sufficient evidence was presented such that the jury could have apportioned damages.

These issues, all relating to the damages award, need not be reached because of our decision to reverse and remand the case for a new trial on the question of damages. Specifically, we leave to the District Court initially the proper handling of the apportionment issue, bearing in mind the respective beneficiaries, adult and minor, and the respective bases for liability: Jones Act, DOHSA, Maritime law and Louisiana Law.

to allow parties to present proof and argument concerning inflationary factors to the trier of fact? Our analysis will begin with a brief review of the *Penrod* decision. In order to illustrate graphically the implications of *Penrod* and why it has to be overruled, we will discuss many of the cases in this Circuit where *Penrod*'s prohibitions were effective. Next, we will summarize the criticisms of *Penrod* which come from other circuits as well as commentators. As our analysis proceeds, it will become clear that the problem is one of fairness to plaintiffs as well as defendants in the trial process. Personal injury awards, once they have been calculated on the basis of projected income and life expectancy, are paid immediately to the plaintiff. It is well-known that if a plaintiff (or his beneficiaries) receives a lump-sum award, totaling the income that the plaintiff would have received throughout the rest of his work life, that money can be invested so as to yield a far greater amount than the initial award. This would be unfairly liberal to the plaintiff. Consequently, the law traditionally permits introduction of testimony, usually by an expert in financial matters, that the lump-sum should be discounted by a factor equal to the interest rate which could likely be earned on a relatively safe investment by an unsophisticated investor. The total projected earnings are thus reduced to the present cash value. However, it will be demonstrated that in an inflationary economy, discounting an award in this manner results in unfairness to a plaintiff or his beneficiaries. When a discount rate is applied to an award in an economy where wage-earners typically receive cost of living increases each year due to inflation, the plaintiff will not be adequately compensated for his loss of future income—inflation will erode the value of the award, and no adjustment for cost of living can be made even though wages continue to increase throughout the economy. On the other hand, if courts respond to this dilemma by refusing to apply a discount rate, as some have, the result would be unfairness to defendants. Quite simply, plaintiffs are to be compensated, by a culpable tortfeasor, but should not be over- or under-compensated. Likewise, defendants found liable should pay no more or less than the amount a plaintiff lost because of the injury. Keeping in mind the goal of fairness to both sides of a controversy, this opinion will consider alternatives and possible guidelines for use in this Circuit. We will establish a flexible approach to the problem which should result in fairness regardless of the economic circumstances that exist at the time of trial. In the process, we overrule *Penrod.*

## II.

### *Prolegomena*

It is crucial to keep in mind that this is really an economic, and not a legal, problem. The likelihood of future wage increases, whether given on the basis of productivity, merit advancement, or inflation, or a combination of them, does not have anything to do with the law. The legal question whether such matters should be considered by the courts is a foundational policy question, the answer to which will be influenced by recourse to the financial and economic community. At trial, the issue may well be a legal credibility of witnesses or competency of evidence, but a pronouncement that inflation is speculative or that workers will or will not receive productivity and merit raises is essentially an economic statement, not a declaration of law.

If we consider, as an example, a person totally and permanently injured by a defendant's negligence, the injured worker is entitled to the equivalent of his lost future earnings. The law decides that much, and the question remains how much money should be given to him now. Once a lump-sum determination· is made, it is clearly unfair to give him the whole amount, because even an unsophisticated investor could earn a great deal in interest. However, in predicting how much money this worker will likely receive throughout the remainder of his work-life, we must consider the likely increase in wages he would have received. These will include possible

advancements from one position to another, any raises due to company productivity, or other merit increases. In addition, in an inflationary economy, we must consider projected cost of living increases which are given by an employer to offset in part the effects of inflation. Each of these factors must be carefully distinguished, since they arise from wholly different causes. Although these factors may not all be present in a particular case, each must be considered in computing the total amount of likely earnings *before* a discount rate is applied to reduce that amount to its present cash value because of investment potential. The goal, albeit ideal, is that if the injured worker has a 20-year work-life expectancy, and he invests his lump-sum award in relatively risk-free investments, he will receive in the nineteenth and in the twentieth year roughly the same amount as if he had worked each of those years. The goal is not, it must be made clear at the outset, to *protect* the lump-sum award from the effect of inflation. Rather, before determining how much now needs to be paid, the goal is to assure the plaintiff the equivalent of the total of all of his future wages, including those likely to be given/received in the form of cost of living increases in response to inflation.

### III.

### *The Prohibitions of Penrod*

In *Johnson v. Penrod Drilling Co.,* 510 F.2d 234 (5th Cir. 1975) (en banc), we recognized "the likelihood that inflation could become a predictable condition for the future," but we were not able to "so surely discern the shadow of inflation as a coming event as to warrant requiring its inclusion in a present rule for calculating future damages." 510 F.2d at 236. Quoting the full initial panel opinion in *Penrod,* we expressly disapproved "the district court's attempt to take into account, in computing the plaintiffs' future lost earnings, inflationary trends in this nation's economy for the next several decades." 510 F.2d at 241. The "influence on future damages of possible inflation or deflation is too speculative a matter for judicial determination." *Id.* Therefore, triers of fact "should not be instructed to take into account future inflationary or deflationary trends in computing future lost earnings, nor should the jury be advised to consider such alternative descriptions of inflationary and deflationary trends as the purchasing power of the dollar or the consumer price index." *Id.*

The defendants and others have suggested that *Penrod* could be "modified", "explained", or watered down by this Court, but not overruled, so that adjustments could be made in individual cases where the influence of inflation was not speculative. However, if fairness requires that we allow some evidence of inflation properly to compensate plaintiffs and avoid windfalls to defendants, any hope of "distinguishing" or "explaining away" *Penrod* crumbles in the face of *Penrod's* own words—inflation and deflation are too speculative for judicial determination, triers of fact should not take into account future inflationary or deflationary trends, juries should not consider changes in the purchasing power of dollars or the consumer price index, and judges should not undertake to instruct juries on such ideas. The prohibition on such evidence could not be clearer.

To argue, as the defendants do, that *Penrod* forecloses only consideration of *future* economic trends, while it allows evidence of past inflation, is to miss the point. The significant basis for predicting future inflation or deflation is *past* inflation or deflation. And the effect of past inflation alone, under a rule forbidding consideration of likely future inflation, leaves economically eclipsed a significant portion of the amount of money the wage-earner may receive in the future.

Even if it were possible to isolate *Penrod* and analyze its terms in an academic vacuum, to reach the conclusion that evidence of inflation is permissible in the Fifth Circuit so long as the jury is not permitted to "speculate" as to the "influence" on future damages of "possible" inflation or deflation, the result of this exercise would be unworkable as a practical matter. For in practice,

*Penrod* has placed a prison-like wall between any evidence of likely inflationary or deflationary trends (and argument or instruction thereon) and the courtrooms of the Fifth Circuit. Our decisions since 1975 on this issue have merely served to place barbed wire on top of the wall. Moreover, it is likely that in other cases, as in this one, evidence of probable increases in wages due to merit or productivity has been kept out of the jury room unwittingly because of *Penrod's* prohibitions. Economic data is readily available concerning past average annual wage increases of workers in the United States, and such data is often broken down into particular professions and geographic areas. But it is difficult to determine the percentage of those increases given for merit-productivity and distinguish the percentage representing cost of living increases in response to inflation. Many plaintiffs have thus been unable to scale *Penrod's* wall and introduce evidence of non-inflationary wage increases, even though such increases are theoretically unaffected by inflation, and thus evidence of such increases should not have been prohibited.

## IV.

### Penrod in Practice

In our determination of whether *Penrod* ought to be overruled, it is important not only to consider what *Penrod* says, but also what this Court through the years since 1975 has said it says. We will look first to the recent cases arising in this Circuit applying *Penrod*. In *Davis v. Hill Engineering, Inc.,* 549 F.2d 314 (5th Cir. 1977), this Court reduced the District Court's award of $628,991 to $425,321 for the total loss of the plaintiff's future earning capacity, because the District Court increased the basic damage award, prior to discounting to present value, to offset wage and price inflation. The plaintiff's expert was unimpeached, and the defendants had no opposing expert. The trial judge was thus free to rely on the expert's testimony, and was apparently convinced of the need to allow over $200,000 to offset expected wage increases due to infla-

tion. 549 F.2d at 331. Nevertheless, we held that until *Penrod* is overruled,

> an inflation element cannot be included in damage computations, either in the form of [i] calculating loss of future earnings without discounting to present value or of [ii] increasing the basic damage award, prior to discounting, with a figure representing the projected inflation rate. The former [i] is the *Beaulieu* [*v. Elliott,* 434 P.2d 665, 671 (Alaska 1967)] method, the latter [ii] the District Court's method in this case.

549 F.2d at 332 (brackets added). Judge Wisdom acknowledged that other circuits consider inflation as a factor in computing future earnings damages, an approach that "more accurately [reflects] loss of future earnings than does a discounted figure because it prevents inflation from eroding the damage award." 549 F.2d at 332. Alas, he conceded, his hands were tied by *Penrod. Id.*

In *In the Matter of S/S HELENA,* 529 F.2d 744, 753 (5th Cir. 1976), this Court remanded for recalculation the District Court's damages award because an inflationary rate was assumed and applied. In determining the damages for loss of support payable to the wives of deceased crew members of a vessel, the trial judge stated:

> I have to some degree offset discount to present value by the effects of inflation and a likely rise in decedent's earnings resulting from increases in the general wage level. I have assumed a discount rate of 5%, and a three per cent inflationary level thus making the net discount rate 2%.

529 F.2d at 753, *quoting* 329 F.Supp. 652 at 660. Other calculations of the damages for loss of support also "seemed to be based on the inflation and present value factors, the expert testimony of an economist as to expected future earnings, and the present cost of annuities that would pay monthly amounts increasing at the estimated rate of inflation." 529 F.2d at 753. Quoting *Penrod*, we remanded to District Court for a more detailed calculation of the damages. On remand, the District Court filed supple-

mental responses heeding our instructions, and *Penrod* was again faithfully followed. *Matter of S/S HELENA, sub nom. Sincere Navigation Corp. v. United States,* 547 F.2d 255, 256 (5th Cir. 1977). The element of inflation was eliminated and the damages recomputed. *Id.*

In *Higginbotham v. Mobil Oil Corporation,* 545 F.2d 422, 433–35 (5th Cir. 1977), *rev'd and remanded on other grounds,* 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978), this Court reviewed the District Court's use of a 5% annual straight line estimated salary increase to calculate the probable future earnings of the deceased. Although the trial judge stated that he did not take into consideration "the decreasing purchasing power of the dollar," we held that under *Penrod* "the plaintiff must bear the difficult burden of proving what portion of the increases would have been given other than as an automatic hedge against inflation." 545 F.2d 434–35. The defendant, wielding the mighty sword of *Penrod,* made the factually unsupported argument that "it is common experience that annual 'raises' are for the most part cost of living wages," therefore a 5% straight line annual increase amounted to a hidden inflation-based award. 545 F.2d at 434. While common experience likewise tells us that some portion of pay raises reflect performance and experience, the plaintiff's expert failed to distinguish between cost of living or inflationary increases and rewards for experience or productivity. 545 F.2d at 435. Thus we rejected the District Court's award based on the 5% future earnings factor, and remanded to give the plaintiff an opportunity to walk the straight and narrow of *Penrod.* Judge, now Chief Judge, Godbold, in his partial dissent, observed that in "innumerable other contexts we accept the events of the past as the basis for an inference as to what the future will hold." 545 F.2d at 437 (Godbold, J.). "Yet we would not permit consideration of evidence that a particular plaintiff had received a $200 per year increase in pay every year for 20 years, unless he could divide it up into 'productivity' pay and 'economic change pay.'" *Id.* (Godbold, J.).

In this single area of projecting future earnings we deny ourselves the best evidence available on the asserted ground that it is not sufficiently reliable, and, in the name of reliability we mandate the artificial conclusion that one will earn the rest of his life what he is earning on the day he is killed or injured. The only thing certain about this is that it is certain to be wrong.

*Id.* (Godbold, J.).

In *Menard v. Penrod Drilling Company,* 538 F.2d 1084, 1089 (5th Cir. 1976), the plaintiff's economic expert estimated that, apart from the possibility that the plaintiff might advance through the ranks of his employer, a worker "would have to get at least 2% per year, on the average, increase to maintain the same buying that he has to-day." A discount rate of 4½% was selected by the expert. *Id.* Because no objection was made, the jury was actually permitted to consider future inflation as a factor in calculating damages. One member of this Court's panel observed that although this was not plain error, it would have been reversible error under *Penrod* had an objection been made. *Id.* (Gee, J., concurring).

Continuing our historical journey into the past, this Court in *Lacaze v. Olendorff,* 526 F.2d 1213, 1222 (5th Cir. 1976), *reh'g en banc granted,* 526 F.2d at 1223, found error in the trial court's overruling an objection to expert testimony on future lost earnings because the expert included a 3% inflation rate in his calculations. On the basis of *Penrod* the case was reversed and remanded on the issue of damages. 526 F.2d at 1223.

In *Weakley v. Fischbach & Moore, Inc.,* 515 F.2d 1260 (5th Cir. 1975), a diversity suit arising out of an electrical explosion in Texas, we affirmed the judgment of the District Court even though the jury considered both future productivity and future inflation in assessing a $300,000 award for lost earning capacity. For this Court, Judge Wisdom observed that although this "Court has writ large its disapproval of calculating future damages by reference to

predictions of future inflation," Texas law applied, and juries in Texas are permitted to weigh evidence of future inflation in setting awards for future damages. 515 F.2d at 1266–67, citing *Penrod*. In a similar federal cause of action we may be certain that this Court would have reversed a judgment based on such a "speculative" jury finding.

Again, specifically on the basis of *Penrod*, we concluded in *Petition of M/V ELAINE JONES*, 513 F.2d 911, 912 (5th Cir. 1975) *cert. denied*, 423 U.S. 840, 96 S.Ct. 71, 46 L.Ed.2d 60 (1975), that the District Court erred by including a 2% per year cost of living increase in the computation of loss of future earnings. We announced that "the trier of fact should not be instructed to take into account future inflationary or deflationary trends in computing future lost earnings."

In *Standefer v. United States*, 511 F.2d 101 (5th Cir. 1975), the District Court, sitting without a jury, awarded damages to a plaintiff for loss of future earnings and included an inflationary factor of 5.5%; in addition, the award of future medical expenses included an inflationary factor of 4.5%. Because *Penrod* foreclosed any consideration of inflation in computing such damages, the District Court's decision was reversed and remanded for a recomputation of damages.

*Robertson v. Douglas Steamship Company*, 510 F.2d 829 (5th Cir. 1975), stands as yet another example of how we applied the *Penrod* strait-jacket. In accordance with the trial court's instructions, the jury divided the plaintiff's award into (i) the amount of basic damages and (ii) the amount of damages sustained "as a result of loss of future wage increases or inflation or decrease in the purchasing power of money." 510 F.2d at 836–37. Of course, the second part of the award was reversed, even though it is possible that a portion of that element was awarded due to likely merit or productivity increases not based upon inflation or cost of living adjustments. Thus we see that although *Penrod* was not intended to eliminate evidence of future wage increases on the basis of merit or productivity, the practical effect of *Penrod* is often to throw the baby of future merit increases out with the inflationary washtub waters.

Finally, on the very day that *Penrod* was published, this Court, in *Law v. Sea Drilling Corporation*, 510 F.2d 242, 251–52 (5th Cir. 1975) *on reh'ing*, 523 F.2d 793 (5th Cir. 1975), held that the District Court's allowance for additional inflationary cost of living increases was improper. Again, the increases in the decedent's income over the years before his death, upon which the trial judge based his reasonable expectation that the decedent's income would have continued to rise, probably reflected increases due to both merit and productivity and not just cost of living increases. Nevertheless, because an element of inflation was considered, *Penrod* was dispositive.

In all of the above discussed cases, this Court, by both its actions and its words, flatly prohibited any consideration of inflation, whether in evidence presented, in jury instructions or in final argument, without regard to the cogency or persuasiveness of the evidence offered to prove that inflation, to some extent, will likely occur. Swept unthinkingly before *Penrod* also were merit-productivity increases. Thus stands the law in this Circuit, until today.

In our attempt to assess the impact of *Penrod* in this Circuit, not only is it necessary to consider our own appellate opinions, as we have done above, but it is also helpful to review some of the District Court opinions where the tentacles of *Penrod* were perceived and predictably effective. In *Complaint of Metcalf*, 530 F.Supp. 446 (S.D. Tex. 1981), the District Court stated emphatically that in its award for loss of earnings in the future, any "future inflationary or deflationary effect on earnings is not to be considered." 530 F.Supp. at 458, *citing Penrod*. Likewise, in *Kratzer v. Capital Marine Supply, Inc.*, 490 F.Supp. 222 (M.D. La. 1980), *aff'd* 645 F.2d 477 (1981), the plaintiff produced an economist who testified as to lost wages predicated upon an inflation factor and an increased productivity factor. The District Court simply cited

*Penrod* and stated that there "was no evidentiary justification for these factors, and the Court declines to accept them, and as noted, utilized a discount figure of 6 percent with no other factors in computing lost wages." Again, we see how *Penrod* often operates to prohibit not only evidence of inflation, but also evidence of likely merit or productivity wage increases. In *McLean v. United States,* 446 F.Supp. 9 (E.D. La. 1977), the plaintiff carefully met his burden of proof by establishing a "productivity" factor of 5.7% on the basis of past merit and change in job title increases over his previous years of employment. Because that factor was in no way compensation for inflation, evidence thereof was admissible under *Penrod.* 446 F.Supp. at 13, 14. In *Thompson v. Offshore Co.,* 440 F.Supp. 752 (S.D. Tex. 1977), the District Court announced that in calculating a decedent's future earnings, any future inflationary effect on wages is not to be considered. 440 F.Supp. at 762. Finally, in *Hamilton v. Canal Barge Co.,* 395 F.Supp. 978 (E.D. La. 1975), allowance for inflation or increased cost of living was denied in light of *Penrod,* and for the additional reason that the diminution in the purchasing power of an award, caused by inflation, is not an item of damage caused by death or by prepayment of future wages. 395 F.Supp. at 987. However, the District Court did allow a 4% annual increase factor on the basis of skill and productivity. *Id.*

*Nesmith v. Texaco, Inc.,* 491 F.Supp. 561 (W.D. La. 1980), stands out as an anomaly to the law of *Penrod.* In startling contrast to the usual acceptance of *Penrod's* rejection of evidence of inflation, the District Court interpreted *Norfolk & Western Railway v. Liepelt,* 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), to say that "in arriving at an award for future loss of earnings the very factors disapproved in [*Penrod*] should now be considered." [7] 491 F.Supp. at 564. While the court was "mindful of the fact that this interpretation of *Liepelt* may be erroneous, and [*Penrod*] may still bar the door to speculative damages as to factors other than income taxes in a case of future loss from personal injuries," the plaintiff was permitted to present expert testimony that the growth rate for wages based upon inflationary factors in the plaintiff's job and geographic area will be approximately 6% over the next 30 years. 491 F.Supp. 564, 565 n. 4. This attempt to break the bonds of *Penrod* resulted in an appeal, disposition of which is being held pending the outcome of the present opinion and *Byrd, see* note 1.

The cases discussed in this section demonstrate the absolute prohibition on any consideration of inflationary or cost of living trends in the courts of this Circuit. District Court judges have found themselves under a duty, imposed by *Penrod,* to prevent experts in their testimony, and attorneys in their arguments, from even mentioning economic trends that would effect future wage increases. Likewise, in their instructions to the jury, District judges have been careful not to mention inflation as a factor in computing damages, or, where inflation was mentioned, the purpose was to explain to the jury that they should *not* consider inflation in their computations. In those cases where the jury was permitted to consider the effect of future inflation on damage awards, either because they heard testimony by an expert or because the trial judge instructed them to consider inflation, we have reversed the judgment and, in most

---

**7.** In *Liepelt,* the Supreme Court said:

[There] are many variables that may affect the amount of a wage earner's future income tax liability. The law may change, his family may increase or decrease in size, his spouse's earning may effect his tax bracket, and extra income or unforeseen deductions may become available. But future employment itself, future help, future personal expenditures, future interest rates, and future inflation are also matters of estimate and predic-

tion. Any one of these issues might provide the basis for protracted expert testimony and debate. But the practical wisdom of the trial bar and the trial bench has developed effective methods of presenting the essential elements of an expert calculation in a form that is understandable by juries that are increasingly familiar with the complexities of modern life.

444 U.S. at 494, 100 S.Ct. at 757, 62 L.Ed.2d at 694.

cases, remanded for a new trial. In non-jury cases, the District Court judges have not been permitted to consider inflation in their assessment of damages. Even where plaintiffs have clearly limited their evidence (as to inflation) to likely cost of living increases, thereby carefully avoiding any inference that the total award should be somehow "protected" from inflation irrespective of wage increases, the evidence has been rejected. In short, *Penrod* in practice has been a firm, inflexible standard that we have been unable to explain or interpret away. The standard is simple: no evidence of inflation may be presented to the trier of fact, regardless of how expert the testimony, how understandable the presentation, or how fair to the parties. Argument of counsel is also forbidden, as is jury instruction by the Court. This standard has at times been so overwhelming that it has prohibited evidence that should have been allowed, such as evidence of likely wage increases based upon merit or productivity, either on a misreading of *Penrod* or a perceived (and sometimes actual) impossibility of separating out inflationary elements from admissible merit-productivity increases. Quite possibly, an employer may take into account rising inflation in his decision to grant promotions, and it would be impossible for anyone, expert or otherwise, to distinguish that part due to merit *only* and determine the percentage amount of the raise due wholly to non-inflationary factors.

## V.

### Penrod and Other Circuits

Worthy of our consideration is how our sister circuits perceive *Penrod*. In 1975, the Eighth Circuit, *citing Penrod*, was able to say that the

federal circuits that have faced the issue in cases involving federally created claims, governed by federal rather than state law, have for the most part rejected testimony, jury instructions or trial court consideration of future inflationary trends in damage assessment.

*Johnson v. Serra,* 521 F.2d 1289, 1295–96 (8th Cir. 1975), *aff'd on remand,* 586 F.2d 1291 (8th Cir. 1978). More recently, however, in the trend toward increasing consideration of inflation, *Taenzler v. Burlington Northern,* 608 F.2d 796, 800 n. 9 (8th Cir. 1979), cited *Penrod* but declined to follow its approach. Expert testimony on future wage increases, when limited to future trends in earnings of a particular group of employees, thus avoiding the excessively general national inflation rate, was found to be acceptable in trial courts.[8] 608 F.2d at 801.

*Feldman v. Allegheny Airlines, Inc.,* 524 F.2d 384 (2d Cir. 1975), a case arising under Connecticut law, cited with approval Judge Friendly's earlier assessment of inflation:

There are few who do not regard some degree of continuing inflation as here to stay and would be willing to translate their own earning power into a fixed annuity, and it is scarcely to be expected that the average personal injury plaintiff will have the acumen to find investments that are proof against both inflation and depression—a task formidable for the most expert investor.

524 F.2d at 388, *citing McWeeney v. New York, New Haven and Hartford Railroad,* 282 F.2d 34, 38 (2d Cir. 1960) (Friendly, J.). The computation by trial Judge Blumenfeld of the discount rate by offsetting the anticipated rate of earnings on a prudent unsophisticated investment by an inflation factor was approved.[9] This computation, sub-

---

**8.** The Court tempered its acceptance of limited expert testimony on inflation with the caution that expert testimony predicting future inflation at a specified rate (i) may mislead the trier of fact by its pretended exactness, (ii) may distort the effect of inflation by not including "concomitant increases for countervailing effects of inflation such as higher rates of return on investment," and (iii) may open up collateral matters that waste time and confuse the issues

such that its probative value would be outweighed. 608 F.2d at 801. As will become clear in our discussion, we share these concerns.

**9.** 524 F.2d at 387. The plaintiff's expert at trial calculated the discount rate by establishing 4.14% as the average annual earning power of a safe investment, and then subtracted 2.87% as the average yearly inflation rate over an

tracting the assumed inflation rate from the rate of interest on a safe investment (the traditional discount rate), yields an "inflation-adjusted discount rate." Judge Friendly, a member of the panel in *Feldman,* was not completely satisfied with this result—*Penrod's* emphasis on "the plethora of uncertainties" that accompany testimony regarding inflationary trends was contrasted with the trial court's apparent construction of "an iron-clad guaranty against the unknown and unknowable future effects of inflation." 524 F.2d at 392 (Friendly, J. concurring). Such protection against inflation is *not* enjoyed by the millions of Americans on fixed pension or investment income, or even by the average worker whose wages do not keep up with inflation. This highlights a weakness in the *Feldman* approach: it assumes that wage increases will mirror inflation. *Id.* Judge Friendly thus predicted that *Feldman* "will not constitute a precedent on the inflation problem in a case arising under federal law." 524 F.2d at 393, (Friendly, J. concurring).

More recently, in a suit brought by an injured cargo checker against a stevedore and a shipowner (neither was his employer), pursuant to the LHWCA, 33 U.S.C. §§ 901 *et seq.,* the Second Circuit carefully considered the question whether and to what extent an award for lost future wages should be adjusted because of inflation. *Doca v. Marina Mercante Nicaraguense, S.A.,* 634 F.2d 30 (2d Cir. 1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981). *Penrod* as well as similar cases in the Third [10] and First [11] Circuits were identified as unsound minority views. 634 F.2d at 36. Broad agreement was perceived among economists that inflation "is a dominant factor on the current economic scene and, despite episodic recessions, is likely to be so for the forseeable future." 634 F.2d at 37.

The District Court in *Doca,* 474 F.Supp. 751, 758 (S.D.N.Y. 1979), found that the plaintiff was entitled to recover $352,560, "representing his future loss of earnings considering both probability of continued inflation and a discount to present value." The extent to which inflation was considered was unspecified, and no computation was provided by the District Court. 634 F.2d at 34. On appeal, the plaintiff urged that the trial judge used a discount factor of 1%, an inference drawn by comparing the difference between the award given and the plaintiff's own projection of future lost wages. 634 F.2d at 34 & n. 4. The defendants objected to the court's computation on the grounds of lack of evidence to support an estimate of future inflation and argued that any adjustment for inflation is impermissible. 634 F.2d at 34–35.

The Second Circuit in *Doca* described two basic approaches as to how inflation could be considered. First, the question of inflation rate may be submitted to the fact finder in one of three ways: (i) by allowing expert opinion, (ii) by requiring the fact finder to apply its own knowledge, or (iii) by permitting the fact finder to apply its own knowledge together with expert testimony. Each of the three contemplate that a separate determination as to inflation is to be made in each case. Second, a rule of law may be adopted that focuses on the somewhat constant relationship between inflation and interest rates, as in the Alaska Supreme Court's view [12] that the inflation rate should be assumed to equal the interest rate, thereby eliminating the discount to present value. 634 F.2d at 38–39. The *Doca* Court was not prepared to specify any particular methodology:

> If litigants prefer to offer evidence as to future rates of both inflation and interest, they are entitled to do so. . . .

---

18-year period, which yielded a 1.27% difference which was rounded up to 1.5%. *Id.*

**10.** *Magill v. Westinghouse Electric Corp.,* 464 F.2d 294, 299–301 (3d Cir. 1972). *But see Pfeifer v. Jones & Laughlin Steel Corp.,* 678 F.2d 453 (3d Cir. 1982) ("total offset method" adopted: no discount rate to present value is applied, because future inflation will offset the plain-

tiff's ability to draw interest on the award), discussed in section XI *infra.*

**11.** *Williams v. United States,* 435 F.2d 804 (1st Cir. 1970).

**12.** *Beaulieu v. Elliot,* 434 P.2d 665 (Alaska 1967).

We emphasize that we are not requiring the use of an inflation-adjusted discount rate.... Litigants are free to account for inflation in other ways, or, if they use the adjusted discount rate approach, to offer evidence of a rate [other] than 2%.

634 F.2d at 39–40. The District Court's award was remanded for reconsideration for two reasons: (i) if a 1% adjusted discount rate was used, it was too low since 2% is the "true cost of money appropriate for use in a computation to determine the present value of lost future wages,"[13] and (ii) the District Court took into account a post-trial wage increase based upon cost of living, therefore duplicative consideration was given to the impact of inflation.[14] 634 F.2d at 40.

*Feldman, supra,* approved the use of an "inflation-adjusted discount rate" of 1.5%. 524 F.2d at 387. The purpose of the method used in *Feldman,* and approved as one possible technique in *Doca,* was to determine the "real yield" of money—that portion of interest gained on virtually risk-free investments which represents only the real growth of the investment and not the losses due to future inflation.[15] The theory is

that the "real yield" of money is roughly 2% in any year, because in periods of high inflation, interest rates will be a bit higher, and in low inflationary periods, the interest rates will still be a little above the rate of inflation.

*Doca* recognized the disagreement among economists over the validity of the assumption that the real rate of interest is constant and consequently independent of inflation, but noted that various economic studies of similar time frames have estimated that the real rate of interest was between 1.5% and 3%. 634 F.2d at 39 n. 10.

VI.

*Penrod and Some Commentators*

In 1977, one commentator—with an error in timing—predicted that "the Fifth Circuit soon could decide ... that *Penrod* is 'substantively indefensible.' "[16] This was precipitated by Judge Wisdom's concurring opinion in *Freeport Sulphur Co. v. S/S HERMOSA,* 526 F.2d 300, 311 (5th Cir. 1976) (Wisdom, J., concurring). Judge Wisdom there expressed his dissatisfaction with *Penrod* and identified the inconsistency in

---

**13.** This figure, 2%, "lies within the narrow range bracketed by many economists as representing the true yield of money." 634 F.2d at 39. There "is substantial opinion that during periods of stable rates of inflation, the real yield of money, whether constant or slightly fluctuating, is approximately 2%...." 634 F.2d at 39 n. 10. This theory of the real rate of interest will be discussed in detail later in this opinion. It may be noteworthy that the Second Circuit was dealing with findings of a District Judge, not a jury verdict.

**14.** The court is here making a critical point with regard to adjusting a discount rate for inflation. There are basically two methods of calculation: In the first, if the sum total of a plaintiff's future earnings is computed by multiplying his annual income for the year he was injured times the number of years of his work expectancy, then it is fair to both plaintiff and defendant to apply a discount rate that has been adjusted for inflation. For example, if a relatively safe investment yields 6%, and the inflation rate is predicted to be 4% over the period of that investment, then the adjusted discount rate would be 2%, and this would be separately applied to each year's projected future earnings, based upon projected actual

earnings not increased by inflation. Under the second method, if the sum total of the plaintiff's future earnings is computed by adding up the annual earnings of the plaintiff based upon likely cost of living increases (*i.e.,* $10,000 in 1981, $11,000 in 1982, $12,000 in 1983, etc.), then the full discount rate, *e.g.* 6% in the above example, should be separately applied to each year's figure of the plaintiff's projected future earnings.

**15.** 634 F.2d at 35. Under this approach, the adjustment to account for future inflation is accomplished by *decreasing the traditional present value discount.* This rate is determined by subtracting the average annual change in the consumer price index over each of several years from the effective annual interest on government bonds held during each of the same years, and then computing the average of the rates resulting from these subtractions. *Feldman, supra,* 382 F.Supp. 1271 at 1306–12.

**16.** Comment, *Future Inflation, Prospective Damages, and the Circuit Courts,* 63 Va. L. Rev. 79, 115–16 (1977).

this Circuit's insistence upon discounting while ignoring inflationary effects. *Id.* The policy concerns of *Penrod,* (i) achieving complete compensation, (ii) preventing speculation, and (iii) simplifying trial procedures, would be served better by adopting an approach that considered the effect of inflation on damage awards. *Id.*

*Penrod* has also been labeled a source of serious judicial error. Kane, *Inflation, tight money, and Penrod: the cost of judicial error,* Texas Trial Lawyers Forum, April-June, 1980, at 3–5. In *Penrod,* we stated that "if future inflation does cause higher wages, experience predictably demonstrates that higher interest rates on investments which have always accompanied inflation will also occur and this factor will mitigate the failure to include an inflationary surcharge in wage rate calculations." 510 F.2d at 236.

> The obvious flaw in this line of reasoning lies in the fact that while interest rates do rise in response to accelerating inflation, a higher interest rate only *reduces* the present value of a future loss, thus further penalizing the plaintiff. The problem for the plaintiff is compounded when the series of future income payments cannot be proportionally increased for the same inflation that drove up the interest rate.

Kane, *supra,* at 3–4.

Spiraling inflation during the years since *Penrod* has indirectly led to much of the criticism of our 1975 opinion.[17] Although consumer prices have fallen in the early months of 1982, which might signal the beginning of the end to "spiraling" inflation,[18] this does not demonstrate that *Penrod* is not so bad after all. The problem with *Penrod* is not primarily its spectacular unfairness in periods of extremely high in-

flation. To the contrary, the danger of *Penrod* lies in its unwillingness to consider the effect of inflation on future wages at all. *Penrod* stands for the inflexible proposition that triers of fact should not consider inflation or deflation at all, whether high or low or nonexistent, in predicting wage loss. At the same time, defendants are freely allowed to show the highest inflation-induced interest rates available on relatively safe investments. Unfortunately, any evidence of the fact that wages will likely increase to combat the eroding effects of inflation remains eclipsed by the Court-declared spectre of *speculation.*

What we seek, in response to criticism from both within and without the Circuit, is fairness with regard to the presentation of economic data by either side in the legal controversies that our federal courts face. The principles that we adopt to facilitate this goal must be flexible enough to remain workable in any economic climate. To this end, the remainder of this opinion will explore the alternatives and adopt those that meet the standards of economic flexibility and fairness to plaintiffs and defendants alike.

## VII.

### *The Real Rate of Interest: A Possible Solution*

In layman's terms, the real rate of interest mirrors the rate of interest that lenders would charge in an inflationless society. Interest rates are much higher because of the expectation of inflation and the uncertainty as to its extent. Thus, the real rate of interest becomes more difficult to calculate. For example,

> You lend [or invest] $100 for ... 30 years, at a rate of interest of 5 percent

---

**17.** The *Statistical Abstract of the United States, 1980* (101st Ed., U.S. Dept. of Comm.), indicates the following annual Consumer Price Index increases:

| | |
|---|---|
| 1975 | 9.1% |
| 1976 | 5.8% |
| 1977 | 6.5% |
| 1978 | 7.7% |
| 1979 | 11.3% |
| 1980 | 14.4% |

*Id.,* Table No. 807, at 486. In addition, the annual percent increase in Consumer Prices for 5-year periods reveals the following changes:

| | |
|---|---|
| 1970–1975 | 6.6% |
| 1971–1976 | 6.9% |
| 1972–1977 | 7.3% |
| 1973–1978 | 8.0% |
| 1974–1979 | 7.9% |

*Id.,* Table No. 706, at 425.

**18.** "Why Prices Are Falling," Newsweek, Feb. 22, 1982, at 59.

per year. The $5 interest paid to you annually will rise or fall in purchasing power depending upon whether or not the general price level of various goods and services falls or rises. If the price level should increase during the first year by 3 percent, this means that of the 5 percent interest ($5 each year) about 3 percentage points (or $3 in real terms) is eroded away by the higher prices you must pay for goods and services. In effect, in real terms you have gotten only about 2 percent interest on your $100 loan [or investment].

A. Alchian & W. Allen, *University Economics* 193 (3d ed. 1972). Thus, the lender who correctly anticipated the rise in price level would have set a higher nominal interest rate on the loan, perhaps 8%, to allow 3% for the anticipated rise in prices and 5% for interest in terms of real purchasing power. *Id.* Accordingly, the nominal or advertised interest rate reflects both the basic or real rate of interest (which would exist absent any inflation anticipations) and an adjustment for the anticipated rise in price levels.[19]

In theory, the real rate of interest represents a possible standard for determining the proper and fair discount rate to be applied to damages resulting from the loss of future income. For courts using this method, the rate of inflation, however calculated, is subtracted from the interest rate for some relatively risk-free investment, and the remainder is the real rate of interest, or discount rate, to be applied to the damages award.[20] In practice, of course, the problem becomes more difficult. Even

**19.** Theoretically, therefore, the components of the legal discount rate applied to future wages awards are (i) inflation and (ii) real interest. For example, if a discount rate of 8% is established by usual acceptable evidence, that figure already reflects a rate of inflation. If a bank is willing to pay 8% interest on a savings account (because that bank can lend or invest the money at a higher rate of interest) and the inflation rate is 6%, the real rate of interest paid on the 8% savings account is only 2%, i.e., 6% of the buying power of the invested dollars is eroded away by inflation.

**20.** This was the approach of the District Court in *Feldman,* with the rate of inflation calculated by averaging the average annual percentage changes in the CPI over a certain number of years, and subtracting that average "inflation" rate from the effective annual interest rates of some safe investment over the same period of years. Another method for determining the real rate of interest, where it is to be used as the adjusted discount rate applied to a future damages award, would be to *predict* the average annual rate of inflation in coming years on the basis of past increases in the CPI and other reliable economic indicators, and subtract that projected rate of inflation from the interest rate available on relatively safe investments available in today's market—for example, U.S. Government Bonds. As in *Feldman,* this method assumes that the plaintiff's future wages would increase at the same rate as inflation.

Again, it must be kept in mind that this inflation-adjusted discount rate, which is a prediction of the real rate of interest in future years, is to be applied in the following fashion:

(i) the plaintiff's annual income at the time of the injury is computed, e.g. $10,000 per year; (ii) the plaintiff's work-life expectancy is estimated, e.g., 20 years; (iii) in trial-date dollars, any likely merit increases in wages due to promotions or productivity, or other types of merit increases such as likely bonuses which are uninfluenced by intervening inflation must be estimated and added to the $10,000 for the years that these increases are likely; (iv) finally, the inflation-adjusted discount rate is applied to reduce each future year's annual income to its present value, and the total of all of the future years' income is the amount to be awarded. *See* note 31 *infra.* Two potential errors in this somewhat complicated method are identifiable. First, the plaintiff *must* be permitted to show likely future increases in wages due to non-inflationary factors; these increases must be added to the lump-sum award before discounting. Second, the defendant must be permitted to show that the plaintiff's wages in the past have not kept up with the inflation rate, or that the plaintiff's wages in the future will likely not keep up with inflation.

The gravest potential error is likely where the plaintiff, by expert testimony or other evidence, projects his future income on the basis of past cost of living increases. This is accomplished by showing that the plaintiff's income has increased at an average rate of, for example, 6% over the past 20 years, and then predicting that his future income will also increase at the same rate. If each year's salary is projected for the remainder of the plaintiff's expected work-life, and all of the years are added together to determine the lump-sum award, then it would be erroneous to apply an inflation-adjusted discount rate to that figure.

where parties to a controversy are able to establish both a projected inflation rate and an interest rate on some risk-free investment, using legally acceptable indexes and tables, the fact remains that the goal of the exercise is to compensate the plaintiff for the income the worker would in all probability actually receive in future years. It is well-recognized that the average wage increases of many workers in the United States have not kept up consistently with inflation.[21] This factor, then, must be ap-

Because wage increases from inflationary factors were used to compute the lump-sum award, the full or traditional discount rate would have to be applied to reduce the award to present value. *See also* Linke, *Assessing the Pecuniary Value of Human Capital: How To Use an Economist To Establish Damages in a Wrongful Death Case*, in Proof of Damages, Chapter 5 (Illinois Institute for Continuing Legal Education 1981).

21. The following table compares the average annual increase in the CPI with the annual percent change of the average weekly earnings in selected private nonagricultural industries.

| YEAR | AVG ANNUAL % CHANGE: CPI | ANNUAL % CHANGE IN AVG EARNINGS |
|------|------|------|
| 1970 | 5.9 | 4.6 |
| 1971 | 4.3 | 6.2 |
| 1972 | 3.3 | 7.5 |
| 1973 | 6.2 | 6.2 |
| 1974 | 11.0 | 6.4 |
| 1975 | 9.1 | 5.7 |
| 1976 | 5.8 | 7.3 |
| 1977 | 6.5 | 7.7 |
| 1978 | 7.7 | 7.8 |
| 1979 | 11.3 | 7.8 |
| 1980 | 14.4 | 7.2 |

*See Statistical Abstract of the United States, 1980* (101st. ed., U.S. Dept. Comm.), Table No. 807, at 486 (CPI percentage changes by years); Dept. of Labor, Bureau of Labor Statistics, Table B–37 ("Average Weekly Earnings in Selected Private Nonagricultural Industries, 1947–80") (*in* Economic Report of the President, 1981).

The following table, based upon 5-year periods, illustrates that the average wage increases in some occupations are higher than the inflation rate as reflected in the CPI, whereas many occupations do not keep up with inflation.

| OCCUPATION | A. 1970–75 | B. 1971–76 | C. 1972–77 | D. 1973–78 | E. 1974–79 |
|------|------|------|------|------|------|
| 1. Private Industry Clerical/Beginning Technicians | 6.7 | 6.9 | 7.1 | 7.5 | 7.7 |
| 2. Private Industry Professional Entry/Advanced Technical Levels | 6.1 | 6.1 | 6.3 | 7.0 | 7.4 |
| 3. Private Industry Experienced Professional/Supervisors, etc. | 6.5 | 6.6 | 7.0 | 7.6 | 8.0 |
| 4. Private Industry Production/Nonsupervisory Workers (nonagricultural) | 7.1 | 7.2 | 7.3 | 7.7 | 8.1 |
| 5. Police and Firefighters (minimum annual salary scales) | 6.0 | 6.3 | 6.0 | 6.1 | 6.1 |

plied to *increase* (e.g., from 2% to 4%) the discount rate so that the plaintiff, whose wages have not kept up and likely will not keep up with inflation, will not receive increases based upon inflation.[22] On the other hand, if the average annual increase in wages in a particular profession has risen above the inflation rate, the plaintiff should not be limited to increases based upon the inflation rate. This factor highlights the major weakness of the "real rate of interest" approach.

A simpler and more accurate approach to the problem is found where the plaintiff shows, by expert testimony or otherwise, all of the increases in wages he is likely to receive during his work-life expectancy. Likely increases in wages due to cost of living increases, merit or productivity increases, or promotion increases could all be separately established by the plaintiff in computing the total amount of lost wages. For most occupations, it is easy to find economic data of general wage increases, which include increases due to cost of living, merit, and productivity. The more difficult task of breaking down the data into the reasons for the increase, e.g. cost of living or merit increases, is not necessary in this simpler method. Then, the defendant has the opportunity to establish, by expert testimony or otherwise, the discount rate which reflects the rate of interest in a relatively safe investment, which is applied to the award to reduce it to present value. If this methodology is followed, the rate of inflation itself is not directly involved—inflation is only indirectly reflected (i) in the cost of living increases projected by the plaintiff (which may be more or less than the rate of inflation), and (ii) in the discount rate established by the defendant (which includes both the real rate of interest and the predicted effect of inflation). The result of such a calculation should not differ greatly from the result obtained

| OCCUPATION | A. 1970–75 | B. 1971–76 | C. 1972–77 | D. 1973–78 | E. 1974–79 |
|---|---|---|---|---|---|
| 6. Police and Firefighters (maximum annual salary scales) | 7.1 | 7.3 | 6.9 | 6.6 | 6.5 |
| 7. Urban Public School Teachers | 7.0 | 7.0 | 6.9 | 6.9 | 6.3 |
| * | * | * | * | * | * |
| 8. CPI Change for Urban Consumers | 6.6 | 6.9 | 7.3 | 8.0 | 7.9 |

*Statistical Abstract ... 1980,* Table No. 706, at p. 425. It is clear from the above table that production and nonsupervisory workers (non-agricultural) in private industry [line 4] have, in most 5-year periods [Col. A, B, C, & E], kept up with inflation [line 8] due to pay increases. Clerical workers and beginning technicians in private industry [line 1], on the other hand, have not fared so well. Likewise, the minimum annual salary scales of police and firefighters [line 5] have fallen well below the inflation rate as reflected in the CPI [line 8].

22. This points up a difficulty in the *Feldman* and similar approaches. The real rate of interest does not reflect the fact that a plaintiff's future wage increases might have been well below or well above the rate of inflation. Once the real rate of interest or the inflation-adjusted discount rate has been computed, it is cumbersome then to attempt to reduce or increase the inflation-adjusted discount rate to account for the likelihood that wages will not increase at the same rate of inflation. Nevertheless, in order to make the prediction as to future wage losses as accurate as possible, this factor must be considered.

For example, if the average annual rise in inflation (reflected in the CPI) in the last 30 years was 5%, and the average annual interest rate of government bonds was 7% during that same period, the real rate of interest, or inflation-adjusted discount rate in *Feldman*, is 2% (7% less 5%). However, if the annual wage increase in the plaintiff's occupation was only 3%, then the defendant could properly argue that the proper "wage-increase-adjusted" discount rate is 4% (7% less 3%). This method more accurately accounts for lost wages since the plaintiff's occupation has not kept up with inflation.

through the *Feldman* approach. However, unlike the *Feldman* approach, this alternative method would more accurately represent the future wages lost by a particular plaintiff, in a particular occupation, in a particular geographic area.[23]

## VIII.

### Economic Predictions and the Courts' Serbonian Bog[24]

We agree with the critics that *Penrod* represents an idea whose time has passed. In an era of inflation, which has been with us for over forty years,[25] it is quite clear that plaintiffs are unfairly penalized by their absolute inability to present evidence of a historical fact—inflation. The likely effect of inflationary trends upon future wages is forbidden even though *Penrod* allows evidence from defendants regarding the applicable discount rate which has been increased by the very inflation so roundly excluded.

However, we are less than satisfied with the so-called Alaska Rule,[26] which by assuming that the discount rate and the inflation rate are virtually identical, unnecessarily penalizes defendants because, as noted above in our discussion of the real rate of interest, interest rates on relatively safe investments will typically ride several percentage points above the rate of inflation.[27] In addition, tied as it is to changes in the Consumer Price Index (CPI), the result would unfairly award the plaintiff the difference between the changes in the CPI and the actual or average increase in wages.

| | | | |
|---|---|---|---|
| 1948 | 3.85% | 1969 | 5.98% |
| 1949 | 3.75% | 1970 | 5.73% |
| 1950 | 3.90% | 1971 | 5.77% |
| 1951 | 3.71% | 1972 | 6.37% |
| 1952 | 3.48% | 1973 | 9.02% |
| 1953 | 3.53% | 1974 | 11.0% |
| 1954 | 3.66% | 1975 | 9.1% |
| 1955 | 3.85% | 1976 | 5.8% |
| 1956 | 4.00% | 1977 | 6.5% |
| 1957 | 4.04% | 1978 | 7.7% |
| 1958 | 3.91% | 1979 | 11.3% |
| 1959 | 3.98% | 1980 | 14.4% |
| 1960 | 4.14% | | |

23. We do not intend to establish, in the present opinion, any single method to the exclusion of others. However, as will be seen, some of the methods of considering inflation in determining awards for loss of future wages more accurately account for the fact that wage increases are not equal to the rate of inflation, nor are such wage increases limited to the rise in the cost of living.

24. "A gulf profound as That Serbonian Bog ... where armies whole have sunk." Milton, *Paradise Lost* II.

25. The Consumer Price Index (CPI) is probably the most relevant indicator of the effect of inflation because it is based upon retail prices for goods and services purchased by urban wage earners and clerical workers. Although it is not completely accurate, it has been deemed sufficiently reliable to be depended upon by the government and by the business community in recent years. The 1974 Economic Report of the President, at 300, Table C–44, *cited in* the helpful opinion of Judge Blumenfeld in *Feldman v. Allegheny Airlines, Inc.*, 382 F.Supp. 1271, 1306 (D. Conn. 1974), reveals the following average annual percentage changes in the CPI from 1940–1973, with the table being brought up to date with data from the *Statistical Abstract, supra* note 14, at 486:

| | | | |
|---|---|---|---|
| 1940 | 6.84% | 1961 | 4.29% |
| 1941 | 6.74% | 1962 | 4.52% |
| 1942 | 6.21% | 1963 | 4.76% |
| 1943 | 5.67% | 1964 | 5.06% |
| 1944 | 5.53% | 1965 | 5.37% |
| 1945 | 5.54% | 1966 | 5.62% |
| 1946 | 5.56% | 1967 | 5.85% |
| 1947 | 4.51% | 1968 | 6.02% |

26. *See Beaulieu v. Elliott,* 434 P.2d 665 (Alaska 1967) (inflation is presumed equal to the discount rate, thus requiring no expert testimony). Not the least concern is: how do judges know that much? The factors going into this equation are economic facts, and presumably economic facts are proved as any other fact—physical, medical, scientific, etc.

The Third Circuit has just recently adopted the Alaska Rule in *Pfeifer v. Jones & Laughlin, supra* note 10, for application in LHWCA negligence actions. *See* discussion in Section XI, *infra.*

27. In the words of one author:

By presuming total offset, under the Alaskan variation the factfinder need not predict future economic trends. However, this ignores rather than enhances predictability. As no sound economic theory supports total offset, the Alaskan variation fails to resolve the speculation inherent in economic forecasting.

Note, *Considering Inflation in Calculating Lost Future Earnings,* 18 Washburn L.J. 499, 509 (1979) (footnotes omitted).

We are much impressed with, but certainly not willing to embrace uncritically, *Feldman*'s approval of an inflation-adjusted discount rate in the neighborhood of 1.5%.[28] 524 F.2d at 387–88. This view represents a compromise between the Alaska rule's penalizing of defendants and *Penrod's* penalizing of plaintiffs. However, fixing the inflation-adjusted discount rate at 1.5%, or even 2% or 3%, would subject this Court to criticisms not unlike those aimed at *Penrod* and even the Alaska rule. In the dynamic and ever-changing world of finance and economics, we as judges cannot rule out that the interest rate on risk-free investments might equal the inflation rate during a certain period such that the Alaska Rule is vindicated. Indeed, the logic behind the Alaska Rule is that in an economy of ups and downs, "it will all come out in the wash"—the interest rate and the inflation rate being, on the average, roughly equivalent.[29] However, any standard which is inflexible in a dynamic economy will likely be unable to cope with the problem of preventing windfalls either to plaintiff or defendant. Although a perfect method may never be found, we must attempt to create standards that are fair to both sides of the controversy, with the trier of fact being allowed to receive and act upon credible evidence of the economic facts bearing, pro and con, on the competing theories.

The methodological basis of *Feldman* must be clearly understood as our analysis proceeds. Quite simply, and perhaps even simplistically, *Feldman* is a backward-looking, past-performance approach:

(1) It begins by considering the effective annual interest rate payable on a certain relatively risk-free investment each year during a particular past period of years, for example, 1940–1980. For each of those years during the period chosen, the average annual percentage change in the Consumer Price Index (CPI) (*see* note 25, *supra*) is determined using historical data.

(2) Subtracting the average annual percentage change in the CPI for each year from the effective annual interest on the investment for that same year yields the actual or "real" rate of interest that an investor would gain during that year in terms of the buying power of the dollars invested. Because a single year in the past several decades might be unreliable, all of the real rates of interest are averaged. The result of such an analysis, for almost any relatively risk-free investment during any 10 or 15 year period in the past several decades, will be approximately 1–3%.

(3) This inflation-adjusted discount rate, the result of subtracting changes in the CPI from safe investment interest rates, is then *projected* over the plaintiff's expected work-life by applying the inflation-adjusted discount rate to each year's estimated salary to reduce the future annual salaries to their present value. The discount factor applied to each year would be different because the present value of a dollar received in the future, e.g., ten or twenty years from trial-date, is much less than the

---

**28.** The District Court in *Feldman* subtracted the average annual increase in the Consumer Price Index from average annual yields on U.S. Government securities between 1940 and 1972, and arrived at an estimated discount rate of 1.5%, roughly the difference between the inflationary component (CPI) and the risk free interest rate. A completely different result was reached by Canada's Supreme Court in four 1978 cases. A 3.5% projected long-term inflation rate was subtracted from the 10.5% rate of return then available on long-term safe investments, yielding a 7% discount damage rate for awards for future earnings and medical expenses. *See* K. Rosenn, *Law and Inflation* 231 (1981). This result, however, is subject to far more criticism than the result in *Feldman. Id.* at 231–32.

**29.** K. Rosenn, in *Law and Inflation* 232–34 (1981), argues that the Alaska Rule is fairer because it builds "in a margin for error on the side of the innocent tort victim rather than on the side of the tort feasor." *Id.* at 234.

> In addition, the approach of the Alaskan Supreme Court has the decided advantages of simplicity, predictability, and economy of effort. It may also eliminate opportunities for confusing the jury and courts that are inherent in speculation about both interest and inflation rates.

*Id.* We are sensitive to the concern for avoiding speculation and confusion, but it is hardly "fairer" to build in a margin of error in favor of plaintiffs *or* defendants.

present value of a dollar received on the date of trial. Indeed, one dollar received even one year from now is worth less than one dollar today.[30]

(4) If wages will increase due to promotion, merit, or productivity, then instead of using the plaintiff's current wages as the amount to be discounted to present value for each future year of expected work-life, each future year's wage is computed by finding what a person in the promoted position would likely be earning in the respective year. All the years are then added together to reach the lump-sum award. This computation is not limited to the single promotion or merit increase that the plaintiff would have received during the year of his injury, but may involve several increases during the plaintiff's work-life expectancy. For example, if the plaintiff is a stock-boy with a 30-year work-life expectancy, and he likely would be promoted in 10 years to stock manager, and in 10 more years to store manager, which is the highest position he would predictably attain, then the trier of fact would compute the trial-date salary of stock manager and store manager. The stock-boy's salary for each of the first 10 years would be reduced to its present value, the stock manager's salary for each of the second 10 years would be reduced to its present value, and the store manager's salary for each of the third 10 years would be

**30.** The following table, taken from V. Brudney & M. Chirelstein, Cases & Materials on Corporate Finance (2d ed. 1979) at 38, illustrates the computation to present value:

TABLE 11· 1. <u>Present Value</u> of a Future $1: What a Dollar at End of Specified Future Year Is Worth Today

| Year | 3% | 4% | 5% | 6% | 7% | 8% | 10% | 12% | 15% | 20% | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | .971 | .962 | .952 | .943 | .935 | .926 | .909 | .893 | .870 | .833 | 1 |
| 2 | .943 | .925 | .907 | .890 | .873 | .857 | .826 | .797 | .756 | .694 | 2 |
| 3 | .915 | .890 | .864 | .839 | .816 | .794 | .751 | .711 | .658 | .578 | 3 |
| 4 | .889 | .855 | .823 | .792 | .763 | .735 | .683 | .636 | .572 | .482 | 4 |
| 5 | .863 | .823 | .784 | .747 | .713 | .681 | .620 | .567 | .497 | .402 | 5 |
| 6 | .838 | .790 | .746 | .705 | .666 | .630 | .564 | .507 | .432 | .335 | 6 |
| 7 | .813 | .760 | .711 | .665 | .623 | .583 | .513 | .452 | .376 | .279 | 7 |
| 8 | .789 | .731 | .677 | .627 | .582 | .540 | .466 | .404 | .326 | .233 | 8 |
| 9 | .766 | .703 | .645 | .591 | .544 | .500 | .424 | .360 | .284 | .194 | 9 |
| 10 | .744 | .676 | .614 | .558 | .508 | .463 | .385 | .322 | .247 | .162 | 10 |
| 11 | .722 | .650 | .585 | .526 | .475 | .429 | .350 | .287 | .215 | .134 | 11 |
| 12 | .701 | .625 | .557 | .497 | .444 | .397 | .318 | .257 | .187 | .112 | 12 |
| 13 | .681 | .601 | .530 | .468 | .415 | .368 | .289 | .229 | .162 | .0935 | 13 |
| 14 | .661 | .577 | .505 | .442 | .388 | .340 | .263 | .204 | .141 | .0779 | 14 |
| 15 | .642 | .555 | .481 | .417 | .362 | .315 | .239 | .183 | .122 | .0649 | 15 |
| 16 | .623 | .534 | .458 | .393 | .339 | .292 | .217 | .163 | .107 | .0541 | 16 |
| 17 | .605 | .513 | .436 | .371 | .317 | .270 | .197 | .146 | .093 | .0451 | 17 |
| 18 | .587 | .494 | .416 | .350 | .296 | .250 | .179 | .130 | .0808 | .0376 | 18 |
| 19 | .570 | .475 | .396 | .330 | .277 | .232 | .163 | .116 | .0703 | .0313 | 19 |
| 20 | .554 | .456 | .377 | .311 | .258 | .215 | .148 | .104 | .0611 | .0261 | 20 |
| 25 | .478 | .375 | .295 | ·.232 | .184 | .146 | .0923 | .0588 | .0304 | .0105 | 25 |
| 30 | .412 | .308 | .231 | .174 | .131 | .0994 | .0573 | .0334 | .0151 | .00421 | 30 |
| 40 | .307 | .208 | .142 | .0972 | .067 | .0460 | .0221 | .0107 | .00373 | .000680 | 40 |
| 50 | .228 | .141 | .067 | .0543 | .034 | .0213 | .00852 | .00346 | .000922 | .000109 | 50 |

Each column lists how much a dollar received at the end of various years in the future is worth today. For example, at 6 percent per year a dollar to be received ten years hence is equivalent in value to $.558 now, in other words, $.558 invested now at 6 percent, with interest compounded annually, would grow to $1.00 in ten years. Note that $1.00 to be received at the end of fifty years is, at 6 percent, worth today just about a nickel. And at 10 percent it is worth only about .8 of one cent, which is to say that 8 mills (.8 of a cent) invested now would grow, at 10 percent interest compounded annually, to $1.00 in fifty years. Similarly $1,000 in fifty years is worth today $8.52, and $10,000 is worth today $85—all at 10 percent rate of interest. . . . Why not make that investment? Formula for entry in table is $1/(1 + r)$.' (No inflation is involved in this table).

---

*See Feldman,* 382 F.Supp. at 1298, Table I, which illustrates the reduction to present value of future annual income using a 1.5% inflation-adjusted discount rate.

reduced to its present value. All these results are added to find the lump sum award.[31]

In light of our discussion, *supra,* of the theory of the "real rate of interest," several critical remarks are appropriate. First, the purpose of an inflation-adjusted discount rate, which simply means that the discount rate (proposed on the basis of safe investment) should be *reduced* by the rate of inflation eroding the profit on such an investment, is fully to compensate the plaintiff such that if the lump-sum award given in court is invested, the plaintiff will be able to receive, as nearly as possible, the amount of assumed income that would have been received each year in the future if no injury had occurred.

However, the *Feldman* approach assumes that the plaintiff's past and future income would increase, as it has, roughly, in the past forty years, along with the CPI. The difficulty with this assumption is that annual wage increases may not keep up with inflation as reflected in the CPI, and, to the contrary, such increases in average earnings in some occupations might be much greater than inflation. Second, the American economy may change radically in the next several years. As evidence becomes available that the next 20 or 30 years will not be like the past 20 or 30 years, then the *Feldman* approach is less helpful. Nevertheless, despite these criticisms, the *Feldman* approach represents a fair and flexible alternative that is clearly superior, and more economically sound, than either *Penrod* or the Alaska Rule.

Lest we lose sight of the forest of practice in these trees of theory, our analysis must move to a practical example.

## IX.

### A Helpful Hypothetical

"The war against inflation is a grim affair." Justice Douglas, *Davies Warehouse Co. v. Bowles,* 321 U.S. 144 at 158, 64 S.Ct. 474 at 482, 88 L.Ed. 635.

We may now consider two hypothetical situations illustrating that the process of computing likely wage increases, due to the effects of inflation and other factors, need not depend upon suspect speculation, the use of strange formulae, or intricate expert prognoses.

First, assume that a plaintiff is totally and permanently disabled and that after allowable deductions for income taxes, social security taxes, and union dues, and after adding various fringe benefits, where applicable, his/her loss of future earnings would be $10,000 per year for the balance of a work-life expectancy of 18 years, or a gross expectancy of $180,000. This plaintiff could purchase for approximately $78,000 enough United States Bonds to allow him or her to receive $10,000 each year from 1981 through 1998.[32] Government Bonds

---

**31.** In *Feldman,* the District Court found that the plaintiff could have been expected to work for 40 more years, from 1971–2011, and would likely have been promoted from her 1971 position of Government Service rank GS–12, step 1, to GS–16, step 7. The court then discounted each year's salary (*e.g.,* 1971: $15,040; 1976: $17,044; 1986: $17,545; 2011: $33,757) *using 1971 pay scales,* to its present value. 382 F.Supp. at 1287. Therefore, only the increases expected on the basis of *promotion* were considered, with no consideration given to inflation or cost of living increases, in reaching the projected annual salaries. The inflation-adjusted discount rate that was applied to each future year's salary gave the plaintiff the benefit of expected cost of living increases and, at the same time, gave the defendant the benefit of the fact that the lump sum award could be invested to yield interest to attain the plaintiff's future wage expectations.

**32.** This approximation is based upon the fact that on April 3, 1981, an arbitrary date chosen for the sake of this example, the plaintiff could have looked at the financial page of any major newspaper, under the heading "U.S. Bonds", and found U.S. Treasury Bonds for sale that would mature at various times through the year 1995. A portfolio could have been selected that would allow the plaintiff to have an annual income of $10,000, after paying income taxes, at least through 1995, during the first 15 years of his work-life expectancy in the above example. On April 3, 1981, it would have cost $78,245.30 to purchase bonds maturing to allow $10,000 annual income (after taxes) until the year 1995, and in 1995 the plaintiff would receive $40,389.30 on maturity of all of the bonds. At that point, $10,000 would be available for income in 1995, and the remaining $30,-389.30 could then be invested to ensure $10,000 per year in the last three years of his work-life

are relatively risk-free investments for an unsophisticated investor, because they typically require no reinvesting of funds over the next 18 years provided that no bonds are redeemed in advance of their maturity. This rough computation takes into account the interest that would be paid on the bonds, as well as the estimated income taxes on the interest received each year by the plaintiff, such that the plaintiff receives $10,000 spendable dollars each year. The economic fact that the plaintiff needs only $78,000 to ensure that he or she will receive the assumed $180,000 in lost future wages

is, of course, the legal justification for applying a discount rate. Significantly, this model assumes that the plaintiff would have received no wage increases, for whatever reason, in the next 18 years.

Second, assume a projected 5.12% annual increase in wages based upon past increases in the national average weekly wage, such that this plaintiff's salary increases from $10,000 in the first year, to $10,512 in the second year, to $11,050 in the third year, and so on until an annual salary of $23,314 is reached in 1998.[33] The total amount

expectancy, 1996, 1997, and 1998. The table below illustrates this procedure if the goal is to give the plaintiff $10,000 per year for 18 years:

| YEAR | CASH FROM MATURING BONDS | CASH FROM INTEREST ON BONDS | TAXES ON TAXABLE INCOME | TOTAL SPENDABLE DOLLARS AFTER TAXES | COST OF BONDS AND CASH TO PRODUCE AT LEAST $10,000.00 SPENDABLE DOLLARS |
|---|---|---|---|---|---|
| 1981 | 0.00 | 9,348.75 | 1,043.26 | 10,000.00 | 1,694.51 |
| 1982 | 2,000.00 | 9,450.00 | 1,070.86 | 10,379.10 | 1,908.90 |
| 1983 | 2,000.00 | 9,253.75 | 1,030.72 | 10,223.00 | 1,946.78 |
| 1984 | 3,000.00 | 8,998.75 | 1,002.27 | 10,996.50 | 2,691.02 |
| 1985 | 3,000.00 | 8,644.38 | 906.80 | 10,737.60 | 3,065.03 |
| 1986 | 3,000.00 | 8,222.50 | 831.27 | 10,391.20 | 3,003.49 |
| 1987 | 4,000.00 | 7,776.25 | 764.72 | 11,011.50 | 3,771.09 |
| 1988 | 4,000.00 | 7,371.25 | 740.12 | 10,631.10 | 3,075.45 |
| 1989 | 4,000.00 | 7,021.25 | 665.23 | 10,356.00 | 3,206.75 |
| 1990 | 9,000.00 | 6,465.00 | 665.68 | 14,799.30 | 6,845.91 |
| 1991 | 0.00 | 6,093.75 | 438.88 | 5,654.88 | 0.00 |
| 1992 | 5,000.00 | 6,093.75 | 561.73 | 10,532.00 | 3,326.69 |
| 1993 | 5,000.00 | 5,534.38 | 454.74 | 10,079.60 | 3,415.06 |
| 1994 | 6,000.00 | 5,067.50 | 375.25 | 10,692.30 | 4,361.31 |
| 1995 | 38,000.00 | 2,398.75 | 9.49 | 40,389.30 | 35,933.30 |
| 1996 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 1997 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | 186,874.00 | 78,245.30 |

To obtain the proper mix of bonds, with varying interest rates depending on the term, over the course of future years, is a task requiring the services of one knowledgeable in bond investments.

33. This assumed 5.12% average annual increase in wages is computed by averaging the percentage change in national average weekly wages by years from 1948–1980. See Dept. of Labor, Bureau of Labor Statistics, Table B–37 (Economic Report of the President, 1981) (non-agricultural workers). These wage increases reflect not only performance and experience, but also the increase in wages given in reaction to inflation. The following table illustrates the

increased wages that, when added together total $284,494.

| | | | |
|---|---|---|---|
| 1981 | $10,000.00 | 1990 | 15,673.58 |
| 1982 | 10,512.00 | 1991 | 16,476.07 |
| 1983 | 11,050.21 | 1992 | 17,319.64 |
| 1984 | 11,615.98 | 1993 | 18,206.41 |
| 1985 | 12,210.72 | 1994 | 19,138.57 |
| 1986 | 12,835.91 | 1995 | 20,118.47 |
| 1987 | 13,493.11 | 1996 | 21,148.53 |
| 1988 | 14,183.96 | 1997 | 22,231.34 |
| 1989 | 14,910.18 | 1998 | 23,369.58 |
| | | TOTAL | 284,494.00 |

*Feldman* and Linke, *supra,* agree that the preferred time for determining these figures, in

earned by the plaintiff, assuming this increase in wages, would be $284,494. Of course, this estimate assumes that the plaintiff would experience wage increases, either on the basis of performance and experience or due to cost of living increases, at the national average (5.12%) of workers over the past several decades.[34] Using the same calculations as above for a risk-free U.S. Bond portfolio,[35] it can be estimated that approximately $120,000 would produce the $284,000 in wages lost with the 5.12% per year increase considered.[36]

In summary, in the first hypothetical situation above, the plaintiff would introduce evidence that his/her annual take-home pay is $10,000 and that he/she would probably have worked for 18 more years. The defendant would simply prove that it would take about $78,000, safely invested, to assure that projected loss of income. In the second hypothetical situation, which is much more realistic in terms of our national economy, the plaintiff not only shows present income and work-life expectancy, but also presents evidence that his/her salary will likely increase, just like average wages have increased in the past, at the annual rate of 5.12% due to inflationary (cost of living increases) and non-inflation-

ary (merit, productivity, etc.) factors. The defendant in its response again can establish that approximately $120,000, safely invested, would allow the plaintiff to spend each year an amount roughly equivalent to his/her projected annual salary.

Comparing the above two hypothetical situations with the approach in other jurisdictions, it is clear that under the Alaska Rule, the plaintiff would receive a lump sum of $180,000 in both situations, because inflation (and cost of living increases) are presumed equal to the discount rate (i.e., safe investments). No discount rate is applied; an obvious windfall to the plaintiff who could, using safe investments, produce $414,000 over the next 18 years.[37] Under *Penrod*, the first situation was common: lump-sum awards were discounted while no evidence of cost of living increases, which account for most of the 5.12% figure in the second situation, was permitted. Under *Feldman's* inflation-adjusted discount rate (real rate of interest) approach, past average wage increases are not considered, but past annual inflation rates are subtracted from past annual interest rates on safe investments to determine the discount rate. The plaintiff in this situation would receive $156,725.26.[38]

order to achieve a fair average, is in the middle of the year rather than either the beginning or the end.

**34.** Refer to note 33, *supra.* A more precise and thus better approach, but one not always possible due to the limitations of statistical economic and labor data, would be to base the annual increase in wages upon the particular plaintiff's occupation and locale.

**35.** Refer to note 32, *supra.*

**36.** For the sake of simplicity, we have reduced the $284,000 award to the present value of $120,000 by assuming a bond portfolio purchase that would yield $15,000 over the 18 years following 1981. It would be much more complicated to ascertain the number and type of government bonds necessary to produce an income that increased at the rate of 5.12% annually.

If the plaintiff were awarded the $284,000 and it was not discounted to present value, the award could yield over $600,000 in principal and interest over the next 18 years, an obviously unfair result.

**37.** Using the same procedure as that used above, buying bonds on April 3, 1981, *see* note 32, *supra*, a plaintiff with $180,000 to invest in government bonds would be able to draw an income of $23,000 per year for 18 years, thus giving a total of $414,000. This amount is substantially more than the plaintiff would be entitled to, even assuming an annual increase in his lost future wages of 5.12% as noted above.

**38.** This result is reached by discounting each year's projected salary by applying an inflation-adjusted discount rate of approximately 1.5%, and then taking the sum of the discounted amounts. The algebraic formula is:

$$PV_0 = \frac{E_1}{(1+i)^1} + \frac{E_2}{(1+i)^2} + \frac{E_3}{(1+i)^3} + \ldots + \frac{E_n}{(1+i)^n}$$

where

$PV_0$ = present value of the asset's future earnings in time zero or today dollars

$E_1$ = income of asset in year 1

$E_t$ = income of asset in year t

██ Given the likely availability of relatively risk-free investments to the unsophisticated investor, and given a dynamic economy, it is not our purpose to establish a single methodology. Nor are we attempting to decide today what precise types of economic data should be found competent by the courts as parties attempt to prove up, or discount, probable future lost wages. We do hold, however, that *Penrod's* prohibition of any consideration of inflationary factors is unfair to plaintiffs and is therefore overruled. The basis for that holding is not that "inflation is here to stay," for we are not capable of making such an economic prediction. The critical error of *Penrod* was its failure to recognize the *effects* of inflation on wages in this country over the past several decades, as they would bear upon the actual dollar amount of money a person would receive over a future period of time. Given that wage-earners have typically received cost of living wage increases on the basis of inflation, plaintiffs should be permitted to establish by factual economic and labor data, and expert testimony, that their income would probably continue to increase in response to inflation in future years if they continued to work.[39] Likewise, using economic and labor data and expert testimony, the defendant should be permitted to rebut such evidence.

Significantly, economic and labor data regarding increases in wages and inflation are not always complex and mysterious so as to require highly skilled economists to interpret them. On the contrary, most of the tables prepared by the Department of Labor, Bureau of Labor Statistics, are readily available and easy to understand, and, more importantly, are considered accurate for most purposes.[40] The availability of such statistics is important because an injured plaintiff (or his beneficiaries) is never to recover damages simply because inflation is likely to erode an award, but only lost wages, and insofar as wages will likely increase in the future, evidence of inflation is permitted to show what future wages will be.

██ Various methods are available that allow the plaintiff to ensure consideration of the effects of future inflation on lost wages. We have already discussed the inflation-adjusted discount rate (or real rate of interest) used in *Feldman*. Although we find such an approach acceptable, and certainly superior to the *Penrod* or Alaska Rule approach, we must emphasize that defendants must be permitted to demonstrate the likelihood that the plaintiff's wages have not kept up, nor will they likely keep up, with inflation. Given this additional factor, the *Feldman* approach becomes less simple. Another approach, illustrated in our hypothetical above, allows the plaintiff to present evidence of average annual national, local, or occupational wage increases over the past several decades, and thereby to present an average annual increase in wages due to merit, productivity, promo-

---

$E_n$ = income of asset in year n

$(1 + i)^t$ = discount factor in year t

$i$ = discount rate of interest

$n$ = number of years asset expected to generate earnings

$PV_0$, the price or present value of an asset, is that amount of money which, when invested at the discount rate (i), would exactly generate from both principal and interest the time configuration of expected annual income. An estimate of the asset's net present value would be obtained by reducing the annual income estimated (the $E_t$) to account for any costs incurred in generating the income in years 1, 2, 3, ..., n.

**39.** Theoretically, at least, plaintiffs under *Penrod* were permitted in this Circuit to produce evidence of likely merit, promotion, or productivity increases that would occur without regard to inflation or cost of living increases. But as we have shown, see *Higginbotham* and *Robertson, supra*, this was frequently denied in practice either because *Penrod* was misread or, more likely, because "merit-productivity" wage increases are often affected by an inflation factor.

**40.** For example, under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 910(f), the compensation or benefits payable for certain injuries are to be increased each year "by a percentage equal to the percentage (if any) by which the applicable national weekly wage . . . exceeds the applicable national average weekly wage [for the prior year]." The Secretary of Labor utilizes Bureau of Labor Statistics data in making this determination.

tion, or cost of living increases. This may, in some cases, be a simpler approach. Other approaches will likewise be found acceptable, insofar as they permit the plaintiff to show likely wage increases, due to inflation or any other reason, and at the same time allow defendants to present evidence of relatively risk-free investments in the economy that would allow a plaintiff to replace lost income in future years.

## X.

### Jury Instructions

■■ Where the case is tried to a jury, instructions are required. Without attempting to write or construct a suggested charge,[41] we point out that the instructions may take several different forms depending on the permissible methodology used.

If the *Feldman* approach is used with its inflation-adjusted discount rate (real rate of interest), the jury must make three separate determinations.[42] First, they must consider and determine all of the future income losses on the basis of the plaintiff's present income and, in addition, any increases that the plaintiff would likely have received due to merit, productivity, or promotion, but *not* inflation. In determining future merit raises or promotions, it should be made clear to the jury that any portion of such increases due to inflation or cost of living raises should not be added into the aggregate sum. Second, the jury must determine, on the basis of the evidence presented to them, the likely increase in the CPI (the acceptable inflation indicator under *Feldman*). Third, the rate of interest available on some safe investment must be determined. On the basis of the second and third findings, the trial judge will then be

in a position to determine the inflation-adjusted discount rate (real rate of interest) by subtracting the projected change in the CPI from the investment interest rate. The result is the discount rate to be applied to reduce the lost future income to its present value to determine the amount of the award.

■■ On the other hand, if the plaintiff shows *all* likely wage increases due to inflation and other factors (as in the hypothetical above where a 5.12% annual increase was used), which allows the defendant to show what amount of money is necessary, using a relatively risk-free investment, to ensure that the plaintiff will receive those projected future wages losses, the jury should be instructed to answer two basic questions.[43] First, the amount of lost future earnings must be determined and must include all likely increases due to inflationary factors such as cost of living increases as well as non-inflationary factors such as merit or promotion raises. It must be made clear that the jury is to project only those increases that the plaintiff would actually have received, with reasonable likelihood. All projected future lost earnings are then aggregated by the jury without considering any discount to present value. Second, the jury must determine the likely earning capacity of an invested award. The answer to this question may take two forms: (1) Where the parties have introduced evidence of the probable availability of particular interest rates, or rates of return, on reasonably safe investments, the jury should find and fix the particular rate of interest available to the plaintiff. This finding would then serve as the discount

---

41. The use of special interrogatories under F.R. Civ. P. 49(a) is generally within the sound discretion of the District Court, *see, e.g., Baumstimler v. Rankin,* 677 F.2d 1061 (5th Cir. 1982); *Central Progressive Bank v. Fireman's Fund Ins. Co.,* 658 F.2d 377, 381 (5th Cir. 1981); *Jones v. Miles,* 656 F.2d 103, 106 n. 4 (5th Cir. 1981); but *see also, Guidry v. Kem Manufacturing Co.,* 598 F.2d 402, 404-06 (5th Cir. 1979), *cert. denied,* 445 U.S. 929, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980); *Thrash v. O'Donnell,* 448 F.2d 886, 890 n. 10 (5th Cir. 1971); *see also* J.

Brown, Federal Special Verdicts: The Doubt Eliminator, 1968, 44 F.R.D. 338.

42. Making liberal use of F.R. Civ. P. 49(a), these three findings, for the sake of clarity and possible review, should be separately stated. *See* note 41, *supra.*

43. Again, these issues should be separately stated so that the trial court, or a reviewing court if necessary, could see clearly what the jury determined on the basis of the evidence.

rate to be applied by the judge to the aggregated lost earnings to reduce that sum to its present value. (2) If the parties wish to show, instead of an interest rate, an amount of dollars that, if invested in government bonds or some other safe investment, would fully compensate the plaintiff for all projected lost future wages, then the jury should consider that evidence and find a particular amount of money that they believe could produce the aggregate lost earnings, which they previously determined. It would then be possible for the judge to determine the amount to be awarded by either (1) applying the discount rate found by the jury to the aggregate lost earnings to reduce that amount to its present value, or (2) adopting the jury's finding as to the amount of money which, if invested, would produce in future years the plaintiff's projected lost earnings.

 In the jury instructions, and, of course, in the final arguments, it should be clear that the purpose of the award for future lost wages is not to protect the plaintiff from future inflation. The goal is simply to replace for future wages actually lost. If the plaintiff's income in future years will be greater due to likely cost of living increases, then the plaintiff is entitled to those increases. But if the plaintiff's wages are likely to increase at a rate less than inflation (cost of living) the plaintiff is only entitled to such wage increases and not an increase based on the rate of inflation. Jurors are thus entitled to consider and determine the actual likely wages that the plaintiff would have received but for the disabling event.

## XI.

### The Search for Federal Uniformity

The Third Circuit recently held, in *Pfeifer v. Jones & Laughlin Steel Corp.,* 678 F.2d 453, 461 (3d Cir. 1982) that the "total offset method" of measuring damages for loss of future earnings, in which the discount factor used to reduce future earnings to present value is presumed offset by future inflation, applies in negligence actions against a vessel owner under the L.H.W.

C.A., 33 U.S.C. §§ 901 *et seq.* As discussed above, this is an adoption of the Alaska Rule, although the Court did not describe it as such. Recognizing that inflation has become an established phenomenon in our economy that must be considered in awarding damages for future lost earnings, the court stated that a uniform federal rule must be established and applied in maritime cases. 678 F.2d at 457. Toward this end, the Alaska Rule was embraced because it contributes to judicial efficiency and eliminates the necessity for economic speculation, thereby introducing greater certainty as well as facilitating settlement of personal injury claims.

The Seventh Circuit recently chimed in, holding that the trier of fact could take inflation into account in computing damage awards. In *O'Shea v. Riverway Towing Co.,* 677 F.2d 1194, at 1200 (7th Cir. 1982), Professor, now Judge Posner, citing with disapproval the panel opinion in *Culver,* declared that "it is illogical and indefensible to build inflation into the discount rate yet ignore it in calculating the lost future wages that are to be discounted. That results in systematic undercompensation." We can but agree.

 We share the concern for uniformity in the federal law of damages in maritime cases. Although we find it imprudent to adopt the Alaska Rule, because it is fraught with the same inflexibility that *Penrod* exhibited, we approve the use of any of the methods outlined for calculating future wage losses that results in fairness to plaintiffs and defendants. We see no reason to make the economic judgment, as did the Third Circuit in *Pfeifer,* that the rate of future inflation will be equivalent to future interest rates.

One important aspect of the problem of uniformity in federal maritime law is illustrated in *Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 101 S.Ct. 2870, 69 L.Ed.2d 784 (1981). It was held that (i) federal courts do not have exclusive jurisdiction over personal injury and indemnity cases under the Outer Continental Shelf

Lands Act (OCSLA), 43 U.S.C. §§ 1331 *et seq.,* and (ii) the issue of whether the jury should be instructed that personal injury damages are not subject to federal income taxation required remand to the state courts for determination under Louisiana law—agreed to be controlling in the case. 453 U.S. at 483–488, 101 S.Ct. at 2877–2880, 69 L.Ed.2d at 795–98. On remand, the Texas Court of Civil Appeals held that Louisiana law does not require a jury instruction that damage awards are not subject to income taxation. 628 S.W.2d 171, 174 (Tex. Civ. App.—Houston [14th] 1982). Moreover, the Texas court found that the Supreme Court's holding in *Liepelt, supra,* that a defendant in a FELA death case is entitled to an instruction that damage awards are not subject to federal income taxation, did not displace the Louisiana rule in this OCSLA case.

Although these precise issues are not presented in this case, we are faced with the need for uniform federal law with regard to the admissibility of evidence on inflation in the determination of future damage awards. Because the opinions in *Gulf Offshore, supra,* demonstrate (i) that state courts have concurrent jurisdiction over nearly all maritime *in personam* suits, (ii) that various state standards with regard to damages are possible, then to the extent it will be favorably received, we view our opinion as minimizing if not eliminating one more source of friction between federal and state courts. Permitting the introduction of inflationary factors in projecting future wage losses brings this Circuit, we believe, more in line with the prevailing view throughout the nation.

## XII.

### *Summary and Conclusions*

Our goal in this opinion is to formulate a simple principle, without being simplistic,

that will permit the determination of damages caused by future loss of wages such that neither the plaintiff nor the defendant is penalized (or given a windfall) by economic theory or reality. To begin with, we reject the suggestion that the discount rate, based upon safe investments, is roughly equal to the wage increases that an individual will receive. On any weekday in trial courts throughout the nation, a discount rate can be established using government securities or savings certificates, as examples of safe investments, for any amount of damages. However, the average wage increases for a particular plaintiff can be specified for a particular occupation and, if appropriate, in a particular area of the country. Thus it would be unfair and unreasonable to rule as a legal matter in advance that the discount rate equals wage increases, or, likewise, to say as a legal matter that the wage increases of a particular plaintiff are equal to the rise in the consumer price index or the average economy-wide wage increases for all workers. Our first conclusion, therefore, is that parties should be allowed, in future earnings damages cases, to present evidence not only of the interest rates available on safe investments, but also the likely wage increases that would have been obtained by the particular plaintiff in his occupation, whether these likely increases are due to cost of living, promotions, merit raises or productivity.[44] Significantly, this is only part of the solution, because the more difficult question is how the likely wage increases are to be established or determined.

We have discussed several acceptable methods that are useful in the consideration of the likely effect of inflation on future wages in a case involving total and permanent disability. Two may be summarized. In the first, the present-day value of the earnings that the plaintiff would likely have received may be calculated in three steps:

---

**44.** "Of course, one cannot *predict* accurately the work-life earnings of each deceased but one can with great precision *project* the earnings of the statistical group to whom he or she had belonged. Specificity to this extent provides better, more reasonable awards than are available to one who uses a simplified procedure of applying aggregative type data." Coyne, *Present Value Of Future Earnings: A Sensible Alternative to Simplistic Methodologies,* Insurance Counsel Journal, Jan. 1982, at 28.

(1) Using the average annual rate of increase in the plaintiff's own salary in the years prior to the incapacitating event, or in the alternative, using the average wage increase of workers nationally or in the decedent's occupation and geographic area over, for example, the ten years prior to his injury, the parties can project the annual earnings for the remainder of the plaintiff's estimated income-generating years. A lump sum of likely lifetime earnings is the result of these calculations.[45] This total would include wage increases due to cost of living increases, merit, or productivity, as they are received by the average worker or, if the plaintiff's own past wages are used, by the plaintiff.[46]

(2) The above lifetime earnings are converted to an average annual income by dividing the lump sum by the number of income-generating years.

(3) The present value of the plaintiff's average annual income is then computed by determining how much money must be invested at the present time to yield each year the average income for the remaining income-generating years.[47] This calculation can take the form of applying a traditional discount rate, and it will be based upon relatively safe investments such as Treasury Bills or bonds, or similar instruments.

A second approach is the *Feldman* inflation-adjusted discount rate, which is based upon the real rate of interest. The steps followed in *Feldman* to ensure that the plaintiff was compensated for future wage losses due to inflation are as follows:

(1) Using historical economical data, the court establishes the effective annual interest rate payable on some safe investment for each year during a particular period of years, *e.g.* 1940–1980.

(2) For each of the years during that period, the average annual percentage change in the CPI is established.

(3) The average annual percentage change in the CPI for each year is subtracted from the effective annual interest rate on the chosen investment for that same year, thus establishing a series of real rates

---

**45.** Assuming without deciding the admissibility under F.R. Evid. 803(8) of tables such as those referred to in note 33 *supra,* as discussed above in this opinion, the plaintiff might use 5.12% as the projected average annual rate of increase for his/her lost future earnings, because 5.12% represents the national average annual increase in wages for nonagricultural workers from 1948–1980. *See* note 33, *supra,* This factor, 5.12%, is multiplied times the plaintiff's annual income during the year that he/she was injured, *e.g.* $10,000, and the result will be the projected income for the year following the year of the injury, *e.g.* $10,512. To compute the projected income for the second year following the year of the injury, 5.12% is multiplied times $10,512, yielding $11,050.21. This computation is continued for each year of the plaintiff's work-life expectancy. When all of these annual incomes are added together, the total represents the plaintiff's projected lifetime earnings.

**46.** This method is most useful where a plaintiff's annual income will likely increase at a somewhat regular rate. If, on the other hand, the plaintiff would likely have experienced several large promotions during his/her work-life expectancy, then the plaintiff may prove up his/her projected earnings on the basis of those promotions, and not some average annual percentage rate of increase. The goal, however, remains the same: the plaintiff should show the grand total of his/her projected lifetime earnings including all increases due to promotions, cost of living increases, or merit or productivity raises, as they would likely be received during the remainder of his/her expected work-life.

**47.** *See* note 32, *supra,* and text accompanying.

In a wrongful death suit, the decedent's maintenance expenses would be determined, in order to adjust downward the damages to reflect personal costs that would have been incurred by the decedent had he remained alive throughout his income-generating years. The Bureau of Census, Technical Paper No. 16 (*Present Value of Estimated Lifetime Earnings,* U.S. Dept. Comm.) suggests various levels of maintenance expenses for different occupations. The estimated expenses of the decedent could be compounded at the same rate of growth as the projected annual earnings to reflect cost of living increases. The above maintenance figure would also, like the projected annual earnings, be converted to an average annual figure. The present value of the lifetime average annual maintenance is next computed. The present value of average annual maintenance is finally subtracted from the present value of average annual income. Coyne, *supra,* at 29–31. *See also* Linke, *supra.*

of interest, or the inflation-adjusted discount rates.

(4) All of the real rates of interest are averaged, and the resulting percentage rate represents the inflation-adjusted discount rate to be applied to the plaintiff's lump-sum award.

(5) In computing the lump-sum total, the plaintiff is permitted to show all likely future wage increases due to promotions, merit or productivity raises, or any other *non-inflationary* factor.[48] If promotions are likely, then the annual salary of a worker *presently in that promoted position* should be used to compute the plaintiff's projected income for the years he/she will be in the promoted position. If the plaintiff can show no likely promotions or raises, then in the number of years remaining in his/her work-life expectancy, the plaintiff's present income is assumed as the projected salary for each year.

**48.** Where the plaintiff projects his/her future income on the basis of likely wage increases due to inflationary factors, then the inflation-adjusted discounted rate should not be used, but rather the traditional discount rate, based upon some safe investment, to reduce the lump-sum award to its present value. *See* note 12, *supra*.

**49.** In enumerating only the bond purchase and *Feldman* approaches, we do not intend to imply that these are the only possible methods of taking inflation into account. Other methods, so long as they furnish a rational means of ascertaining and discounting inflationary damages, are certainly acceptable. One such method, essentially a variation of the *Feldman* approach, is illustrated in the following table. Assume the injured or killed worker had an 18 year expected working life, a base salary of $10,000, a 5.12% expected annual increase in money wages (representing merit as well as cost of living increases), and a 10% discount rate. As the table shows, the present value of $284,494.17 is $114,232.99:

| YEAR | WAGE | PRESENT VALUE FACTOR | PRESENT VALUE |
|---|---|---|---|
| 1 | $10,000.00 | .909 | $9090.00 |
| 2 | 10,512.00 | .826 | 8682.91 |
| 3 | 11,050.21 | .751 | 8298.70 |
| 4 | 11,615.98 | .683 | 7933.71 |
| 5 | 12,210.72 | .620 | 7570.65 |
| 6 | 12,835.91 | .564 | 7239.45 |

(6) The inflation-adjusted discount rate is then applied to reduce each projected annual salary to its present value, and the total of these future discounted annual salaries is the amount to be awarded.[49]

The above methodologies are only suggested approaches, and not strait-jackets, for courts to use in determining future earnings. The methodologies do illustrate, however, the issues upon which evidence may be presented in this Circuit now that *Penrod* is overruled. In response to the plaintiff's evidence on inflation, defendants will continue to be permitted to introduce evidence of the interest rate available on risk-free investments, and plaintiffs will continue to be able to rebut that evidence. Plaintiffs will now also be able to introduce evidence, not only on inflation, but more importantly on the likely wage increases in the decedent's or injured party's occupation, basing their calculation on past average wage increases and future inflation, with

| YEAR | WAGE | PRESENT VALUE FACTOR | PRESENT VALUE |
|---|---|---|---|
| 7 | 13,493.11 | .513 | 6921.97 |
| 8 | 14,183.96 | .466 | 6609.73 |
| 9 | 14,910.18 | .424 | 6321.92 |
| 10 | 15,673.59 | .385 | 6034.33 |
| 11 | 16,476.07 | .350 | 5766.62 |
| 12 | 17,319.64 | .318 | 5507.65 |
| 13 | 18,206.40 | .289 | 5261.65 |
| 14 | 19,138.57 | .263 | 5033.44 |
| 15 | 20,118.47 | .239 | 4808.31 |
| 16 | 21,148.53 | .217 | 4589.23 |
| 17 | 22,231.34 | .197 | 4379.57 |
| 18 | 23,369.58 | .179 | 4183.15 |
| | $284,494.17 | | $114,232.99 |

This calculation functions similarly to the *Feldman* approach—future wages are projected, separately discounted, and then summed to obtain the proper award—except that while the *Feldman* court explicitly excluded inflationary changes from both the future wages and the discount rate, this method includes inflation in both calculations. The future wage payments include both merit increases and cost of living adjustments, which, of course, attempt to counter inflation. Then, instead of using the 1.5% real interest rate as a discount factor, one substitutes a higher discount rate (e.g. 10%) which takes into account both the real rate of interest *and* expected inflation.

all parties and trial courts keeping in mind that wage increases are influenced by, but not necessarily dependent upon or identical to, inflation.

### Postlude

Having devoted substantial consideration to the economic problems inherent in properly taking inflation into account, we now emphasize that in most cases the apparent difficulties should not arise. As complicated as this subject appears to be, it is a place for vigorous pre-trial discussion and handling between the trial judge and the attorneys. In the great majority of cases, we believe, the parties can and will be able to stipulate to the methodology, discount rate, inflation rate, the admissibility of economic data, tables, etc. and other technical aspects, as well as to any particular issues of fact underlying the calculations. In a jury trial, this should include, to the maximum extent possible, agreement as to specific issues, the form and manner of their submission, appropriate jury instructions and interrogatories and any objections thereto.

And, to the extent complete stipulation is not reasonably possible the formalized pre-trial effort should assure that the areas of dispute are considerably reduced and certainly well defined.

If the trial court can bring the parties together in this fashion, economic technicalities should not trouble the jury and, we fervently hope, the issues, if any, for appellate review will be sharply presented on an adequate evidentiary record preserving identifiably distinct legal problems.

To eliminate doubts we also declare that this decision is immediately effective to control cases (i) now being tried, (ii) tried hereafter and (iii) those heretofore tried and now on, or subject to, appeal in which the issue has been properly and adequately raised. And while not fundamentally a *Penrod* problem, the question whether to allow pre-judgment interest may well arise in some cases. In those instances where the substantive law permits a court to award pre-judgment interest,[50] the court must discount the damage figure back to the date of the event, i.e. injury or death, and may award pre-judgment interest for the period between the event and judgment. *See Havis v. Petroleum Helicopters,* 664 F.2d 54 (5th Cir. 1981). *See generally* Linke, *Assessing the Pecuniary Value of Human Capital, supra;* Annot., *Award of Prejudgment Interest in Admiralty Suits,* 34 A.L.R. Fed. 126, 228–38 (1977).

On the basis of the above analysis, we overrule *Penrod,* and remand the present controversy to the District Court on the issue of damages. The panel opinion is adopted in all other respects.

REVERSED AND REMANDED.

JAMES C. HILL, Circuit Judge, with whom R. LANIER ANDERSON, III, Circuit Judge, joins, concurring in part and dissenting in part:

"BUT, ON THE OTHER HAND ...." [1]

Given the task of interpreting and applying the law, our court embarks upon a survey of economics. We took the case to reconsider and reevaluate the holding of this court in *Johnson v. Penrod Drilling Co.,* 510 F.2d 234 (5th Cir. 1975) (en banc). I agree with my colleagues that *Penrod* is wrong, but I find it wrong because it is only half right.

In *Penrod* we correctly held that, in forecasting future earnings, the jurors should not be allowed to apply their opinions as to what effects future inflation would have on

---

**50.** *Compare National Airlines, Inc. v. Stiles,* 268 F.2d 400 (5th Cir.), *cert. denied,* 361 U.S. 885, 80 S.Ct. 157, 4 L.Ed.2d 121 (1959) (Death on the High Seas Act, 46 U.S.C. § 762, permits pre-judgment interest) *with Doucet v. Wheless Drilling Co.,* 467 F.2d 336, 340–41 (5th Cir. 1972) (in action on law side under the Jones Act, 46 U.S.C. § 688, pre-judgment interest is not permitted).

**1.** President Harry S. Truman once observed, in frustration, that there is a great need for a one-armed economist because the economists who counselled him, after detailed advice, were prone to say, "But, on the other hand ...."

wages or other earnings.[2] The lesson of *Penrod* is that no value ought to be based upon speculation and that the forecasts of lay jurors on the subject of inflation cannot be made anything better than speculation. We thus limit plaintiff's proof of lost wages to a projection of wages currently earned or capable of being earned paid in dollars of current value. We recognize that a defendant ought not be required to pay the full value of such an annuity in a present lump sum equal to the total of all wages yet to be earned. Payments for future earnings are to be discounted to their present value, and this is just and proper. However, we did not address the discount rate other than glibly to state, "the calculated gross future earnings must be reduced to present value by the use of *an appropriate interest rate prevailing at the time and place of trial.*" 510 F.2d at 237 (emphasis added).

Inasmuch as the plaintiffs must not, in my opinion (and as *Penrod* held), be permitted to seek an increased award because of anticipated inflation, the defendant should not be entitled, in discounting future payments, to use an interest rate insofar as it is based upon anticipated inflation. Predictions of inflation or deflation ought to be taken out of both sides of the equation. In Part VII of the majority opinion, "The Real Rate of Interest: A Possible Solution," we have the solution I prefer. It was expressed by Judge Blumenfield in *Feldman v. Allegheny Airlines, Inc.,* 382 F.Supp. 1271 (D. Conn. 1974), and affirmed in *Feldman v. Allegheny Airlines, Inc.,* 524 F.2d 384 (2d Cir. 1975). It requires and permits the least speculation and provides the nearest approach to fairness to all parties of all the methods suggested for dealing with issues which are a magnet for speculation and are invitations to unfairness—to plaintiff, defendant, judge, and jury.

The majority does not disapprove the Feldman approach; however, it prefers an alternative means of remedying the imbalance *Penrod* creates. It endorses allowing

the jury to consider the effect of inflation in the calculation of damages, the plaintiff's side of the equation. For the reasons expressed quite well by Judge Johnson, in dissent, I believe that approach to be far too speculative.

I suggest that a careful perusal of the opinion for the majority is all that is needed for one to conclude that judges and jurors ought not embark upon—or be instructed to embark upon—the crystal-ball gazing necessary to economic forecasting. Were a trial judge to instruct a jury by verbatim recitation of parts I–IX of the majority opinion, the judge would have committed the error of a totally confusing instruction. Yet even properly instructed as Part X suggests might be done, the court would be indulging in the unrealistic assumption that the jurors would, in deliberation, go through the economic analysis of the first nine parts of the opinion. Further, we would assume that, having done so, the conclusions of the jurors would, somehow, be more nearly accurate than the prognostications of acknowledged economic experts have been over the past several decades, during which time the experts have often been in total disagreement, and, as Judge Johnson points out, often totally wrong!

I cannot fully agree with the conclusions of Judge Johnson's dissent, though, because it rejects the *Feldman* approach in favor of the Alaska Rule, which treats inflation and discount rates as offsetting each other totally and therefore canceling each other out. As the majority and Judge Johnson's dissent both recognize, the Alaska Rule results in an unjust enrichment to a plaintiff who receives a present undiscounted award for losses not to be realized for years to come; the defendant is wrongfully required to pay more than is due. In contrast, the *Feldman* approach is theoretically proper because it accounts for the value of the use of capital by applying the real rate of interest as the discount rate.

**2.** We did not hold that the jurors might not consider expected merit and productivity increases, but, as the majority points out, some

trial courts have interpreted *Penrod* as forbidding even those projections.

The dissent asserts that the discount rate under the *Feldman* rule ought be established as a matter of law and contends that determining the real rate of return would involve too much guesswork. I envision the rate as a factual matter. I acknowledge that a full blown trial to ascertain the real discount rate might be fraught with much of the same confusing economic expert clashes of opinion that I find deplorable in the procedures envisioned by much of the majority opinion. However, realistically, I do not anticipate great trouble on this score. The "real discount rate" or "real interest rate" is a small figure when compared to rates of inflation or interest rates including inflationary factors. While there may be marked academic differences in its establishment, it seems to come out from all calculations within one or two percentage points. Thus, it may be 1.5% to some and 3% to others, but the total dollar impact upon the expected verdict in a given case is so relatively small that litigants will likely find it hardly worth the cost of the expert testimony necessary to disputatiousness. In the vast majority of cases, once the rule is established, the rate will be agreed upon and stipulated. In those cases where agreement on an appropriate discount rate is not reached, experienced trial judges can be expected to help the parties. One might require, pretrial, a clear statement of the contentions of each so that the expenses of the party prevailing on that issue, incurred in the proof of it, can be charged to any party found to have disputed groundlessly.

This is not the perfect solution, but I suggest it is the best. Interest rates are obviously not made up purely and simply by adding a constant and unchanging charge expected for the use of money to the amount to be charged in anticipation of inflation. The law of supply and demand no doubt plays a role. When massive government deficits require governmental institutions to enter upon the money market place for massive borrowing, the demand for limited capital funds will cause the real charge for the use of those funds to increase somewhat above the percentage that would be charged were the demand smaller. Thus, the "real interest rate" may move upwards or downwards over a period of years depending upon the supply of capital savings compared to the demand for borrowing. A discount at the current real interest rate might not represent the discount that would have occurred some years ago or that will be taking place some years hence. This bit of uncertainty may be tolerated, however, in the type of case we are here considering where some uncertainty (life expectancy, future health and earning capacity, etc.) is necessarily acceptable; we accept some uncertainty because there must be a way to approach justice in these cases. It is a rare case in which the parties do not stipulate to life expectancy and the expected duration of earning capacity. I anticipate that the same approach would be taken to the establishment of a real rate of interest.[3]

For these reasons, I concur in the judgment. I would pronounce our reaffirmance of the *Penrod* rule forbidding evidence of inflation or consideration of inflation by the jurors in predicting future earnings. I would disapprove of it insofar as, in dicta or otherwise, it permits the discount of future earnings at an interest rate "prevailing ·at the time and place of trial"—an interest rate including a hedge against inflation.

Preferring the second choice of both the majority and Judge Johnson, I would simply require district courts to apply the *Feldman* rule.

CHARLES CLARK, Circuit Judge, with whom RONEY and GEE, Circuit Judges, join, dissenting:

Seven years ago *Johnson v. Penrod Drilling Company* told litigants, lawyers and

---

**3.** The discount rate to be applied could be reached in another and, perhaps, better way. For federal actions, the Congress, aided by the information gathering system of committee hearings, could from time to time determine the existing real rate of interest, unaffected by an inflationary factor, and, by law, provide that this rate be the discount rate to be applied. Presumably, the product of such deliberations would be more nearly accurate than the deliberations of lay jurors with only the information the parties could provide.

trial judges in this circuit that simplicity and efficiency of trial procedures and instructions were the path to justice in jury trials of future damage cases. This court en banc said predictions as to inflation rates and income tax effects were too contingent, too variable, and too speculative for jury consideration. In *Liepelt,* the Supreme Court required that juries be told to consider the effect of present income tax laws on future damages. Today's decision goes much further. It puts back in these trials the pre-1975 debates which had developed between economics experts and the prolix instructions on the use of complex formulae they generated. Because these trappings only serve to suppress the common sense assessment of damages by lay jurors, I respectfully dissent.

*Penrod* held that to attain simplicity and efficiency future earnings were to be reduced to present value by the use of the "interest rate prevailing at the time and place of trial." The majority sees this as deducting an inflationary increment that unfairly penalizes the damaged party. It would eliminate the perceived inequity by adding a balancing inflationary factor to future damages. Judge Johnson's dissent, on the other hand, would solve this problem by eliminating the discount. The majority's remedy compounds the speculative and complicates trial procedures.[1] Its professed goal of formulating "a simple principle" is lost in a fog of words and figures. The remedy of Judge Johnson's dissent, though clear and uncluttered, always deprives the damaging party of more than the cost of the wrong. I respectfully assert *Penrod* presents no "inequity" or "problem" and remains a better solution than either.

What is overlooked or misunderstood in casting *Penrod* aside is that its use of the prevailing interest rate at the time and place of trial to discount present awards of future dollars works in terms of marketplace realities. No one wins. No one loses. No one speculates. Under *Penrod* the

plaintiff's future losses are based on fact, not speculation. The prevailing interest rate is not only simple to prove, but, because it is real and current, it is also available to the plaintiff for the investment of the funds he has received. The majority's speculation that it is not available is just that—speculation. Whatever factors (inflation, money supply and the like) that make the rate high or low for discount purposes are available for investment purposes. If it is not so, then the rate is not the true prevailing rate.

Even the recent history of this young nation reveals that economic cycles come and go—oft times with dramatic, unpredicted swiftness. Most economic alchemists claim they can refine a "real" or "true" rate of interest from the base figures. The trouble is they don't agree on its amount. *Penrod* did not require a search for this rare value because it would lead into a maze of expert opinion and instruction as confounding as the search the majority requires.

It is said that death and taxes are the only things certain in this world. They are bound to soon be joined by confusing jury instructions because, as the law develops, more and more judges are able to convince themselves that more and more words can clarify the obscure and simplify the complex. As Judge Johnson's dissent aptly demonstrates, the majority opinion is autogenous proof this is not so. *Penrod's* rule is not perfect, but I insist it is the fairest workable way to justice in these cases.

Trial courts have taken *Penrod* further than it was intended to go by denying plaintiffs the right to prove and recover predictable future wage increases for merit, productivity or longevity. I agree this should be corrected in this case. I respectfully dissent from the remainder of today's mandate.

GEE, Circuit Judge, dissenting:

I join in Chief Judge Clark's dissenting opinion, adding only that the majority ap-

---

1. Judge Hill's concurring-dissenting proposal that we adopt the Second Circuit's *Feldman* rule would operate in the same way. See the

37-page district court opinion with its four full-page tabular appendix exhibits, 382 F.Supp. 1271, which makes this clear.

proach throws open the gates of fairyland, where in future there will be fought mighty battles in the air between experts opining learnedly under oath upon the intrinsically unknowable. Persons unable—as Judge Johnson's opinion illustrates—to forecast reliably what the inflation (or deflation) rate will be one year ahead will swear to what it will be in forty. It seems especially ironic that we decide future rates of inflation sufficiently susceptible of knowledge to indulge sworn speculation about them today at the very time when it has become possible to believe that shortly they may become insignificant.

TJOFLAT, Circuit Judge, dissenting:

Appellants' ask this court to abrogate the rule of *Starnes & Johnson v. Penrod Drilling Company*, 510 F.2d 234, 241 (5th Cir. 1975) (en banc) that "the influence on future damages of possible inflation or deflation is too speculative a matter for judicial determination." Because appellants, in their case in chief, failed to proffer competent, admissible evidence of the impact of inflation on lost, future wages and because a jury cannot consider this issue without such evidence, appellants cannot benefit from a holding of this court overturning the decision in *Penrod*. Appellants are not entitled to the new trial on damages the majority prescribes, and therefore I must respectfully dissent.

I.

In *Penrod Drilling Company*, this court—in the face of competent expert testimony from two economists on the issue of inflation—adopted a rule that excluded any evidence or jury instructions concerning the impact of inflation on damage awards because "we still cannot so surely discern the shadow of inflation as a coming event to warrant requiring its inclusion in a present rule for calculating future damages." *Penrod, supra,* 510 F.2d at 236. Thus, regardless of the qualifications of an expert or the basis for his testimony, we proscribed any effort to factor in the impact of inflation on recoveries for future losses. As Judge

Brown points out for the majority, the "Penrod rule" as subsequently interpreted by this circuit has amounted to a "flat prohibit[ion] [of] any consideration of inflation." Majority Opinion, at 290.

In this case, the appellants sought, and were refused, a jury instruction concerning the impact of inflation on damages awards. Record, vol. 4, at 865, 867–68. On appeal, they urge us to change the *Penrod* rule barring such an instruction and to hold that competent evidence of inflation may be considered by a fact-finder in calculating lost earnings. However, appellants established no foundation whatsoever in the record for such an instruction. Indeed, they did not proffer or even attempt to proffer a scintilla of evidence in their case in chief concerning inflation; for strategic reasons they did not want the jury to hear such evidence. They now have the audacity to claim in their brief to the court en banc that the trial judge "would not permit any proof, or even a bill or a proffer of proof (sic) concerning inflation or deflation, or the rapidly decreasing value of a dollar. He would not permit it for the record, for proof on this appeal, or for any other purpose." Plaintiffs-Appellants Post-Submission Brief at 5. The record reveals that this claim is false. The *Penrod* issue is therefore not before us.

II.

The district court held a pretrial conference in this case and entered a comprehensive pretrial order which set forth, among other things, contested issues of fact and law. Nowhere in that order is there any indication that the plaintiffs wanted the jury to consider inflation in calculating damages. Record, vol. 2, at 333–49.

Although the plaintiffs listed "Dr. Seymour Goodman," an economist, as a potential witness, they did not indicate that his testimony would bear on inflation. *Id.* at 346. In fact, Dr. Goodman was not called, and plaintiffs called no witness to testify on inflation. Plaintiffs made no proffer of any kind on inflation during their case in chief. Their claim that the trial judge would not permit them to do so is therefore

unfounded. This is made clear by a colloquy that occurred between the court and counsel during the plaintiffs' cross-examination of a defense expert witness, Hattier. It was during the cross-examination of Hattier that plaintiffs first attempted to inject inflation into the case. Record, vol. 7, at 745–48.

By plaintiffs' admission, their choice not to call their expert, Goodman, during their case in chief was purely tactical: "The reason that the Culvers did not call their 'expert' actuary was to avoid putting the high discount rate before the jury. . . ." Plaintiffs-Appellants Post-Submission Brief at 5. Thus, plaintiffs deliberately did not make a proffer concerning inflation.

The defense called Hattier as a bond expert for the sole and narrow purpose of establishing an appropriate discount rate in accordance with *Chesapeake & Ohio Railway v. Kelly,* 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117 (1916). When counsel for plaintiffs attempted to ask Hattier on cross-examination about "inflationary trends" and the value of the principal of a thirty-year government bond at maturity, the court sustained a general objection from defendants. Record, vol. 7, at 742.

Shortly thereafter, plaintiffs' counsel approached the bench and sought to proffer the testimony he thought Hattier could give concerning inflation, a subject upon which he did not testify on direct nor for which he had been qualified by counsel. The court properly resisted plaintiffs' attempt to make defendants' expert its own:

> Make whatever proffer you want. Let me tell you this. In the first place, you just make your proffer, make your statement here, but let me tell you this is excludable because he didn't go into this on his direct examination. It is improper cross-examination. You rested your case and you can't bring this witness back as part of your case in chief. You offered no evidence on that in the case in chief.

Record, vol. 7, at 745. Plaintiffs' counsel then stated that he wished to ask Hattier about inflationary trends, the impact of inflation on bonds and other investments, etc.

Record, vol. 7, at 746–48. Counsel offered no proof that Hattier would so testify, or, more fundamentally, that he was qualified to give such expert opinion testimony under the Federal Rules of Evidence. *See* Fed. R. Evid. 702.

At the conclusion of this brief proffer, the trial judge made it clear that such evidence would not be admitted for two, independent reasons: "you can't use the cross-examination of this witness as part of your case in chief," Record, vol. 7, at 747, *and* "I will not permit you to introduce any evidence before the jury relative to inflation in view of the present law that I am bound by which is the *Penrod* case." Record, vol. 7, at 748. It was "[f]or those two reasons [that] the attempt to elicit that testimony in the presence of the jury is denied." Record, vol. 7, at 747.

The trial then ended without further testimony and without any attempt by plaintiffs to reopen their case to introduce inflation testimony. The issue of lost future earnings was thus presented to the jury on evidence concerning the life and work expectancies of plaintiffs' decedent, and the hourly wage for a superintendent of pushers of an anchor pulling crew, the decedent's job at the time of his death. There was no evidence concerning the effect of inflation on future earnings. A charge conference preceded counsel's closing arguments to the jury. The record is unclear as to whether plaintiffs sought a jury instruction allowing the jury to take inflation into account in their damages award, but I assume one was requested because the court told counsel that it could not argue inflation to the jury. Record, vol. 8, at 764–65.

The net effect of plaintiffs' trial strategy was that a party which made a tactical decision not to offer evidence on inflation nonetheless sought an inflation instruction asking the jury, I suppose, to call upon its genius, general knowledge and previous information to arrive at the inflation component of its damages award. The district court properly refused such an instruction. The refusal of the court to give it is the only error the appellants now present to this en banc court.

### III.

Whatever may be said about *Penrod* and the merits of the rule concerning inflation, one thing is clear: juries cannot be left in the wilderness to speculate about the future effects of inflation on lost wages where the record contains no evidence on that subject. To reach this conclusion we need not decide whether in a case that presents competent, probative evidence of inflation, *Penrod* should be overruled, thus permitting the jury to consider such evidence in calculating prospective wage losses.

The majority attempts to excuse the failure of appellants to preserve the *Penrod* issue by stating: "Given this flat prohibition *against introducing testimony* (or making argument) as to future inflationary trends on the basis of *Penrod,* it makes no sense to argue that Culver may not raise this issue on appeal simply because he (sic) did not proffer an expert on inflation." Majority Opinion, at 285. (Emphasis added.) This implicitly acknowledges the appellants' failure to take the necessary steps to preserve an issue for appeal, *see* Fed. R. Civ. P. 46, but asserts that because the trial court prevented Culver from making a record we must overlook this failure.

- The majority's statement that the trial court prevented plaintiffs from "introducing testimony" is simply incorrect. As I have pointed out, the plaintiffs, for purely tactical reasons, rested their case without even attempting to introduce inflation evidence. They made no attempt to preserve the *Penrod* issue for appeal. All they preserved for the Court of Appeals is the right to a jury instruction on the impact of inflation on future wages in a case where they deliberately refrained from introducing evidence on inflation. Such an instruction without any record evidence regarding inflation would invite the lawyers in closing argument to call upon the jury simply to invent an inflation figure out of thin air. I cannot countenance this result.

What the majority forgets—in its haste to reach the *Penrod* issue and change our rule concerning inflation—is the responsibility of this court to do justice for the litigants in the case before it. No one needs to be reminded that "The judicial power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority"; U.S. Const. art. III, § 2. The requirement of a "case or controversy" prior to the exercise of the judicial power is designed precisely to prevent what has occurred here: abstract judicial law-making in the absence of facts and parties with a dispute requiring its exercise. Here, the *Penrod* issue is not properly before us, and to raise it without a proper foundation is both to run roughshod over the constitutional restraints on our power and to require the defendants to submit to the retrial of an issue properly laid to rest in the district court.

The district court acted well within its discretion in preventing the plaintiffs from making a defense expert their own witness on cross-examination, *see* Fed. R. Evid. 611(b), and it correctly denied a requested jury instruction that was plainly erroneous.

I would affirm the judgment of the district court.

FRANK M. JOHNSON, Jr., Circuit Judge, dissenting:

I dissent. I find unacceptable the majority's proposals for incorporating the effects of future inflation into damage awards. Those proposals are founded upon a delusive belief in the ability of any court, jury, or expert to avoid utter speculation in attempting to predict future rates of inflation. Today's holding will inflict upon the district courts burdens that are both complex and time consuming. Those burdens will serve no useful purpose because they will result in estimates of the damages due a plaintiff no fairer or more accurate than other, simpler methods would permit.

I do recognize that the courts must somehow deal with inflation in setting damage awards. I advocate adopting an approach that, as a matter of law, treats the inflation

rate as totally offsetting the rate at which an award is discounted [1] and that therefore considers neither rate in computing an award. Such an approach, which the majority calls the "Alaska Rule," is simple to apply and in my judgment more accurate than the formulae the majority advances for dealing with inflation.

### I.

The majority, although noting that other methods might be acceptable, presents and endorses two specific proposals for negating inflation's effect on damage awards.[2] The approach that it deems most desirable, in a bare summary, would increase an award by the likely increase in a plaintiff's wages

resulting from all causes, including inflation, and then would discount the award at a rate reflecting the return on a relatively safe investment.[3] A second approach would follow what the majority conceives to be the rule announced in *Feldman v. Allegheny Airlines,* 524 F.2d 384 (2d Cir. 1975). The majority's treatment of the *Feldman* Rule is inconsistent [4] and may betray a misunderstanding of the Second Circuit approach.[5] Essentially, however, the majority would compute the difference between inflation and the discount rates. After consideration of any possibility that the rate of yearly increase in the plaintiff's wages would differ from the rate of inflation, the award for each future year of plaintiff's expected life would then be discounted by

1. By "discounting" I mean reducing the stream of future payments on an award to its present value. The rate at which an award is discounted will depend on the rate of interest it could earn until the time at which it would be intended to compensate a plaintiff. For example, if an award is intended presently to compensate a plaintiff for $100 lost two years in the future, he should receive now a sum that, if invested and if earning interest, would give him $100 in two years. If the interest rate is 5%, he should receive $90.70 now. *See R. Lipsey & P. Steiner, Economics* 410-11 (4th ed. 1975); *see also* majority op. at n. 38 (giving discounting formula).

2. The majority informs us neither of who has the prerogative of choosing a particular method nor of which method should be used under particular sets of circumstances. It may intimate that the choice is that of the plaintiffs. *See* majority op., *supra,* text at n. 43.

3. The majority opinion writes solely in terms of wage increases. For convenience I write in similar terms. I note, however, that inflation would affect components of a damage award other than wages, such as future costs of medical care. I can conceive of no reason to limit consideration of inflation solely to its effect on future wages.

4. There are at least two areas of confusion in the majority opinion. First, at times the Court correctly interprets *Feldman* as establishing a real rate of return on capital from *past* interest and discount rates and endorses use of that approach. *See* majority op. at nn. 30, 48. At other times the majority interprets the *Feldman* approach as establishing a real rate of return from projected *future* increases in prices and from returns on safe investments (also presumably based on projections). *See id.,* text

at nn. 20–21, 42. Second, at times the majority refers to *the court* as establishing the factors relevant to the real rate of return, *id.,* text at n. 48, while at other times it refers to *the jury* as setting the factors from which a real rate of return could be determined, *see* text at n. 42. It would be wise for the majority at least to give a coherent presentation of the proposals it endorses in order to guide the trial courts.

5. The majority does not seem to realize that the "real rate of return" on capital as used in *Feldman* means the return on investments over the long term assuming no inflation and disregarding short term fluctuations. The majority suggests that the *Feldman* approach is defective because short term variations "[i]n the dynamic and ever changing world of finance and economics" will render any real rate of return erroneous. There will indeed be such short term fluctuations, but they would not affect the validity of a long term rate. The *Feldman* district court in fact averaged the short term fluctuations in order to derive a long term rate. *See Feldman v. Allegheny Airlines,* 382 F.Supp. 1271, 1293–95, 1309–12 (D. Conn. 1974), *aff'd in relevant part,* 524 F.2d 384 (2d Cir. 1975). Moreover, if there is a constant real rate of return, it can be established by relying on prior years' evidence. There would be no need, contrary to what the majority at times suggests, *see* majority op., *supra,* text at nn. 20–21, 42, for projections of future inflation. The ability to avoid speculation about future inflation is, in fact, one of the prime advantages of the approach in *Feldman, see* text at nn. 18–19, *infra; Doca v. Marina Mercante Nicaraguense,* 634 F.2d 30, 39 (2d Cir. 1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981).

that difference.[6] These proposals, the majority asserts, best ensure that a plaintiff receives no more nor less than is his due in a damage award.

I agree that the paramount concern of a court should be ensuring that a damage award is as accurate and fair as is practically possible. I disagree, however, with the majority's notion that its proposals will ensure that a plaintiff will receive no more nor less than is his due. The majority's analysis is curiously limited: it involves only computational precision, the determination of which formulae most accurately eliminate the effect of future inflation on a damage award *once the rate of inflation is known*.[7] I note that even considered on such limited terms the majority's preferred approach is not beyond objection: simplifications that the majority introduces into its calculations will overstate an award to a plaintiff.[8] I also think it unfortunate that

**6.** The majority indicates, at least at times, that a *Feldman*-type approach should establish a real rate of return as a matter of fact. Other courts have interpreted *Feldman* as being applicable as a matter of law. *See Doca, supra,* 634 F.2d at 39 (although elsewhere suggesting that parties could dispute real rate of return); *Freeport Sulphur Co. v. S/S HERMOSA,* 526 F.2d 300, 310 11 (5th Cir. 1976) (Wisdom, J., specially concurring); *see also* Note, "Future Inflation, Damages, and the Circuit Courts," 63 *Va. L. Rev.* 105, 130 31 (1977). Since a real rate of return could be established, as it was in *Feldman, supra,* 382 F.Supp. at 1293 95, from statistics of prior years and should not vary with each case, there seems no reason to require finding a real rate of return as a matter of fact and not of law. I discuss adopting such an approach as a matter of law, *infra, see* text at nn. 22 24.

**7.** The majority in fact misestimates the different results produced by independently incorporating the inflation and discount rates by the *Feldman* approach and by the Alaska Rule. *See* majority op., text at nn. 32 40. In the example it provides for its approach independently incorporating the inflation and discount rates, it increases the award due the plaintiff by a rate including merit and productivity wage increases. It does not consider merit or productivity increases under either of the latter two approaches. The failure to include such increases is contrary to the majority's own statements in other parts of its opinion. *See* majority op., *supra,* n. 20 & text at n. 31. Under either of the last two approaches, noninflationary wage increases can be determined by looking to the wages commensurate with those increases in the year of the award. The district court in *Feldman* used such an approach. 382 F.Supp. at 1287; *see also* majority op., *supra,* n. 31.

While commenting on the majority's "helpful hypothetical," I should emphasize that it is helpful in showing the comparative accuracy of several methods of considering inflation's effect on damage awards *only if* we have established a rate of inflation to use in comparing the results. If we cannot establish such a rate, and, as I argue in text, I believe we cannot do so without pure speculation, the comparison is meaningless.

**8.** Footnote 36 of the majority opinion, in explaining how to apply the majority's preferred proposal, assumes a constant yield for each year of an award rather than an award increasing annually at the rate of wage increase. Such an assumption will overcompensate a plaintiff because it will provide him more money than is his due in the early years covered by his award. A plaintiff will, of course, receive less than is his due in the later years of his award, but that will not offset his high early awards, which he could have invested until he needed to use them to make up for receiving less than is his due in the later years. A simple example will demonstrate the point. I assume a plaintiff would earn $10,000 originally, increased by 5% each year and that he could invest any amount he receives at 5%. I also assume an award over 10 years. In the table below column A is the year; B is the plaintiff's income increased by 5% annually; C is the total 10 year award averaged over each year— which is what the majority would award the plaintiff each year; D is the difference between C and B; and finally, E is the cumulative amount the plaintiff would have if he saved (or withdrew from earlier savings) the amount in column D and invested that amount at 5% (or withdrew that amount from investments).

| A | B | C | D | E |
|---|---|---|---|---|
| 1 | $10000 | $12578 | $2578 | $2578 |
| 2 | 10500 | 12578 | 2078 | 4785 |
| 3 | 11025 | 12578 | 1553 | 6577 |
| 4 | 11576 | 12578 | 1002 | 7908 |
| 5 | 12155 | 12578 | 423 | 8726 |
| 6 | 12763 | 12578 | −185 | 8977 |
| 7 | 13401 | 12578 | −823 | 8603 |
| 8 | 14071 | 12578 | −1493 | 7540 |
| 9 | 14774 | 12578 | −2196 | 5721 |
| 10 | 15513 | 12578 | −2935 | 3072 |

As of the last year of his award a plaintiff would have received the entire award that is his due and would have an additional $3072.

At the least the majority's simplification implicitly concedes the need to sacrifice perfect

the majority was unable to decide on one specific proposal to mandate. Since the two formulae that the majority endorses will produce different results even if using the same data, the amount of an award will depend arbitrarily on the method of computation chosen.[9] Such concerns, however, are not critical to my dissent. The fundamental weakness of the majority's holding is its failure to consider at all the sheer speculation involved in any prediction of future inflation rates.[10] The majority's willingness to consider only computational precision in gauging the effects of inflation creates a mere illusion of accuracy because the underlying data that the formulae would use are themselves unreliable.

I do firmly maintain that it is quite evident that economic theory cannot predict future inflation rates with any degree of certainty. A survey of the general literature for the past several years illustrates the sorry tale of the repeated confusion, contradictions, and uncertainties of economic forecasts. See, e.g., "Where the Big Economic Models Go Wrong," Bus. Week 70 (March 30, 1981); "An Amazing Contradiction in Economic Prophecies," Bus. Week 39 (May 28, 1979); "Inflation Defies the Guidelines," Bus. Week 32 (February 12, 1979); "Mixed Grades for the Economists," Bus. Week 30 (December 25, 1978); "Theory Deserts the Forecasters," Bus. Week 50 (June 29, 1974); Forbes, "Economics Shouldn't Be a Branch of Mathematics,"

Forbes 21 (January 18, 1982); "If We Don't Know Where We Are, How Can We Tell Where We Are Going," Forbes 119 (April 2, 1979); "Stockman's Ladder," Newsweek 66 (February 9, 1981); "Black-Box Forecasting," Time 92 (February 23, 1981). Even the Council of Economic Advisors has conceded that "its ability to forecast inflation is at best imperfect." The Economic Report of the President 1976 20; see also Council of Economic Advisors, Economic Report of the President 1982 215 (admitting federal government cannot fully anticipate the course of the economy); Solow, "The Intelligent Citizen's Guide to Inflation," Public Interest 49 (Winter 1975) (suggesting we may be less able to predict price levels 5–10 years into the future than in the past when stable prices were the norm). Moreover, these complaints about economic forecasting generally concern short term forecasts. Over a longer term, events as diverse—and unpredictable—as spending to finance a southeast Asian war, an oil embargo, or world agricultural shortfalls could have a profound impact on future inflation. See W. Branson & J. Litvack, Macroeconomics 408–14 (1976); Council of Economic Advisors, Economic Report of the President 1978 139–42. Cf. Economic Report of the President 1974, supra ("increasingly complex and interdependent world" increases difficulties in forecasting inflation); "Inflation Defies the Guidelines," supra (discussing variety of factors affecting inflation).

accuracy to the dictates of simplicity and practicability.

9. Assuming a discount rate of 6%, an inflation rate of 5%, a thirty year time period for the award, and an award equivalent to a constant $10,000 a year, an approach independently incorporating inflation and discount rates would result in an award of approximately $260,100 while an approach discounting each year's earnings by the difference between the inflation and discount rates would result in an award of $258,100. See Note, "Future Inflation, Prospective Damages, and the Circuit Courts." 63 Va. L. Rev. 105, 111 (1977). The $2,000 difference, although not huge, is significant. More important, I find theoretically objectionable the notion that an award should depend merely on the method of its calculation. That objection is particularly apposite where, as here, it is avoidable. Since the majority clearly prefers an

approach separately incorporating the inflation and discount rates, there is no reason not to mandate that approach whenever practicable.

10. I assume for the purposes of this criticism that the Feldman approach of the majority involves projecting future inflation. Cf. note 4, supra. Although I would find an approach using past inflation to be less objectionable, I ultimately also would reject that approach. See text at nn. 22 24, infra; see also n. 6, supra.

Also, I note that the majority's first proposal incorporating all future wage increases without separating inflationary increases and then separately discounting would not avoid the need to consider future inflation. Any estimate of future wage increases must, implicitly or explicitly, include projections of future inflation.

To attempt to predict the course of inflation for decades into the future is to attempt the impossible, given our present economic knowledge.[11] Finally, common experience supports the conclusion that predictions of inflation simply are beyond our capabilities. Older generations can still recall the Great Depression and can remember how unexpected that event was.

I realize that any estimate of the appropriate damages to award a plaintiff involves substantial speculation. I believe, however, that the degree of speculation involved in prediction of future inflation is far greater than that which we usually require of a jury and that it is not essential to computing an award. Requiring a jury to resolve the amount of future inflation is not a duty similar to that traditionally performed, and usually performed well, by a jury: the finding of facts regarding a particular incident or individuals. Rather, we are demanding that the jury become a seer for the future course of national, or even world, events. Nor is the universe of relevant factors so limited as it is in the usual findings required of a jury. As noted earlier, the factors that may affect inflation are extremely broad in scope and hardly within the practical limits for a jury's consideration. Finally, most predictions that a jury must make involve findings that can at least be actuarially or statistically estimated. That simply is not the case with estimates of future inflation. Admittedly, of course, a court or jury must at times make some finding concerning a fact not limited to the particular circumstances of a case, as

when it determines the effect of future income taxes.[12] Even those findings, however, I believe involve less speculation than occurs in predictions of future inflation. We at least can be relatively certain that income taxes will be a fixture of our future. That is not necessarily the case with inflation; the volatility of changes in inflation rates over time alone renders them unique.[13] More important, there is not the necessity to speculate on future inflation that exists for findings on, for example, income taxes. No adequate method exists for considering the effect of income taxes on an award without speculating on future taxes. That is not so with inflation. As I note later in this opinion, a related variable, the discount rate, can be used to offset inflation and eliminate the need for its consideration.

The inability of the majority's proposals adequately to deal with inflation in computing damage awards is not the only sin of those proposals. The majority's holdings, both in the proposals adopted and in the procedures used for carrying out those proposals, are complex and extremely time consuming. Elaborate expert testimony will be necessary.[14] And this testimony will not be limited to future inflation and future returns on investments. A court must also allow evidence of whether a plaintiff's wages would keep up with or would increase at a rate faster than the inflation rate. By extension it appears that a court must allow separate expert testimony on

11. The majority's further requirement that courts investigate even whether a plaintiff's wages would have kept up with inflation takes its proposals to an absurd extreme. Given the unpredictability of inflation, there simply is no way of determining whether particular wages would keep up with it.

12. Under *Norfolk & W. Ry. Co. v. Liepelt,* 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), a jury must consider income taxes in making an award of damages.

13. I note that for significant portions of this country's history, roughly the late 19th century after the Civil War and the period between the World Wars, the dominant trend in prices was deflationary. *See Solow, supra, Public Interest*

at 36-39. Future inflation may not be so inevitable as the majority presumes.

14. The majority acknowledges that some courts have allowed a factfinder to use its common experience as well as expert testimony in determining the rate of future inflation, *see* majority op., *supra,* text at n. 12; *Riha v. Jasper Blackburn Corp.,* 516 F.2d 840, 845 (8th Cir. 1975), but it never indicates to the district courts whether it approves of reliance on common experience. Given its repeated references to the use of expert testimony, however, the majority seems implicitly to disapprove of such reliance.

whether any other component of an award that might be affected by inflation, such as an award for future medical expenses, would increase at a rate greater or less than the inflation rate. *See* note 3, *supra.* Moreover, the majority's ambiguous suggestion regarding special verdicts, *see* majority opinion at note 41, appears to disregard Fed. R. Civ. P. 49(a) [15] in removing use of special verdicts from the discretion of the trial court, thereby vastly complicating the task of the jury and of the trial judge.

I conclude that the majority has erected an elaborate superstructure on a foundation of sand. If it were possible to predict the course of inflation over the decades ahead, the majority's formulae would do so with some precision. Without accurate predictions, however, working through the formulae will be an exercise in futility that will impose serious new burdens on the district courts.

## II.

Having taken the position that there is no way to predict future inflation without undue speculation, there remains for me the task of establishing some fair and practicable approach for estimating damage awards. I do not believe that this Circuit should continue to follow *Johnson v. Penrod Drilling Co.,* 510 F.2d 234 (5th Cir.) (en banc), *cert. denied,* 423 U.S. 839, 96 S.Ct. 69, 46 L.Ed.2d 58 (1975). As the majority notes, *Penrod* permits an award to be discounted at a rate that includes some prediction of future inflation. Not also allowing some increase in the award to account for inflation unfairly penalizes the plaintiff. Faced with the need to find some alternative method for dealing with the pernicious effects of inflation, I believe that the most desirable approach would be to offset, as a matter of law, the inflation rate with the discount rates. [16]

The adoption of such a rule would have several advantages over the majority's plan. [17] It would be simple to apply and would require no time consuming expert testimony. Speculation about future inflation would be unnecessary. Since the inflation rate and discount rate are covariant in

---

**15.** Rule 49(a) states that a court *may* require special verdicts. The former Fifth Circuit has held that use of such verdicts or interrogatories is within the discretion of the district court. *E.g., Central Progressive Bank v. Fireman's Fund Ins. Co.,* 658 F.2d 377, 381 (5th Cir. 1981); *Jones v. Miles,* 656 F.2d 103, 106 n. 4 (5th Cir. 1981); *Miley v. Oppenheimer & Co., Inc.,* 637 F.2d 318, 334 (5th Cir. 1981); *see also* 5A J. Moore & J. Lucas, *Moore's Federal Practice* § 49.03[1], at 49 10—49 13 (1982) ("[T]he court has complete discretion as to whether a special or general verdict is to be returned.... [T]his should not be reviewable, except, perhaps, for gross abuse, which can rarely be shown.") (footnote omitted). The majority apparently has chosen to ignore Rule 49(a) and to make use of special verdicts non-discretionary. *See* majority op., *supra,* nn. 41 & 42.

**16.** An alternative approach that would have the advantage of simplicity would be to allow the jury merely to rely on its common experience in finding future inflation rates. *See Bach v. Penn Central Transp. Co.,* 502 F.2d 1117, 1122 23 (6th Cir. 1974). However, I do not believe such an approach would be desirable. If experts cannot forecast inflation, a factfinder can hardly be expected to use more than pure guesswork in its findings.

**17.** I recognize that in *Norfolk & W. Ry. Co. v. Liepelt,* 444 U.S. 490, 495, 100 S.Ct. 755, 758, 62 L.Ed.2d 689 (1980), the Supreme Court disapproved of the exclusion of one factor in an award, income taxes, to offset a rule on attorneys' fees. That disapproval is inapplicable here. The factors considered in *Liepelt* were not remotely related to each other. By contrast, the factors at issue here are closely interrelated and opposite in their effect on damage awards.

Judge Wisdom, in his specially concurring opinion in *Freeport Sulphur Co. v. S/S HERMOSA,* 526 F.2d 300, 311-12 (5th Cir. 1976), noted that *Chesapeake and Ohio Ry. v. Kelly,* 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117 (1916), requires discounting lost future earnings to present value in F.E.L.A. cases. In advocating that the Fifth Circuit adopt the Alaska Rule for incorporating the effects of inflation into damage awards, which would eliminate discounting, he suggested that *Kelly's* holding could be limited to F.E.L.A. cases. I am not convinced that *Kelly* need literally control even in the F.E.L.A. context. In offsetting the discount rate by the inflation rate, a court would implicitly be considering the effect of discounting on an award and would be complying with the spirit of the mandate in *Kelly.*

opposite directions,[18] the rule would be relatively accurate, certainly much more accurate in my opinion than the majority's proposals.[19] Finally, the effects of inflation would be considered uniformly and consistently for all damage awards. Since the inflation affecting awards will not vary in cases decided at similar times and compensating injuries over similar time periods, such uniform treatment is fairer than an approach in which estimates of inflation vary with each case.[20]

Having espoused the adoption of an approach that would deal with inflation as a matter of law, I must resolve one further issue, which of two variants of such an approach is preferable. One variant would establish a positive real rate of return on capital, that is, the rate of return that would exist on a relatively safe investment if there were no inflation. Such an approach would mirror that of *Feldman v. Allegheny Airlines,* 524 F.2d 384 (2d Cir. 1975) (1.5% real return); *see also Doca v. Marina Mercante Nicaraguense,* 634 F.2d 30 (2d Cir. 1979) (suggesting using 2% real rate of return), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981).[21] A second variant, the Alaska Rule disparaged by the majority, would treat the inflation and discount rates as offsetting each other totally and therefore cancelling each other out. Such an approach has been advocated or adopted by several courts. *E.g., Freeport Sulphur Co. v. S/S HERMOSA,* 526 F.2d 300, 308–13 (5th Cir. 1976) (Wisdom, J.,

specially concurring); *Pfeiffer v. Jones & Laughlin Steel Corp.,* 678 F.2d 453 (3d Cir. 1982); *Beaulieu v. Elliott,* 434 P.2d 665 (Alaska 1967); *Resner v. N. Pac. Ry.,* 161 Mont. 177, 505 P.2d 86 (1973); *Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027 (1980).

I find a *Feldman*-type approach tempting since theoretically it may be preferable to the Alaska Rule.[22] Ultimately, however, I, like Judge Wisdom in his specially concurring opinion in *Freeport Sulphur, supra,* would adopt the Alaska Rule. A rule establishing a positive real rate of return in practice involves as much guesswork as ruling that the inflation and discount rates offset each other completely—as an examination of the data that the district court in *Feldman* used in setting a 1.5% real rate will establish. *See Feldman v. Allegheny Airlines,* 382 F.Supp. 1271 (D.Conn. 1974), *aff'd in relevant part,* 524 F.2d 384 (2d Cir. 1975).[23] Moreover, according to some economists, at least in an inflationary period the inflation component in the discount rate will fail fully to take into account the actual rate of inflation because the future depreciation in the value of money is not entirely foreseen. *E.g.,* I. Fisher, *The Theory of Interest* 43 (1930); *see also Freeport Sulphur Co., supra,* 526 F.2d at 310 & n. 7 (Wisdom, J., specially concurring). Such an effect would offset at least partially any positive real rate of return on capital. Even the assumption that there is some

---

**18.** The discount rate includes a component incorporating expectations about future price levels. R. Lipsey & P. Steiner, *Economics* 417 (4th ed. 1975). The higher the expected inflation rate (and the rate at which an award would be increased to account for inflation) is the higher the discount rate (and the rate at which an award will be reduced) will be.

**19.** A court should, of course, still consider non-inflationary increases in wages. It could do so by considering the wages commensurate at the time of the award with the increases the plaintiff could be expected to receive in the future due to, for example, promotions or higher productivity. *See* note 7, *supra.*

**20.** Judicial estimates of future inflation rates have in the past varied widely. One commen-

tator has found estimates varying between $1\frac{3}{4}$% and $5\frac{1}{2}$%. *Note, supra,* 63 *Va. L. Rev.* at n. 32 & n. 180.

**21.** As I stated earlier, I believe that the approach of *Feldman* would be better adopted as a matter of law, not of fact. *See* note 6, *supra.*

**22.** Theoretically the real rate of return should be positive to account for the opportunity cost of the foregone use of capital.

**23.** The district court in *Feldman* found that the real rate of interest varied between – 2.9% and + 2.0% on short term treasury bills and varied between – 8.9% and + 3.7% on long term federal notes. 382 F.Supp. at 1309, 1312; *see also Note, supra,* 63 *Va. L. Rev.* at 131.

constant real rate of return is open to question; some economists have suggested that the real rate of return will vary with the inflation rate. J. Keynes, *The General Theory of Employment, Interest, and Money* 142–43 (1936); Carlson, "Short-Term Interest Rates as Predictors of Inflation: A Comment," 67 *Am. Econ. Rev.* 469 (1977); Steindl, "Price Expectations and Interest Rates," 5 *J. Money, Credit & Banking,* 939, 948 (1973). Given the uncertainty described above in setting any positive real rate of return, I firmly believe a court should err, if it errs at all, in favor of the plaintiff, the non-culpable party, by establishing a total offset of the inflation and discount rates.[24]

### III.

To summarize, I believe that the majority has sunk into its own Serbonian bog in adopting cumbersome, complicated, apparently illegal (in disregarding Fed.R.Civ.P. 49(a)), and time consuming procedures for the district courts to follow in incorporating the effects of inflation into damage awards. Those procedures cannot be justified by their precision in offsetting the effects of inflation because the data the procedures would use would be the product of pure speculation. A better procedure than that proposed by the majority and far simpler to apply, would, as a matter of law, treat the discount and inflation rates as totally offsetting each other.

---

24. *See* Note, *supra,* 63 Va. L. Rev. at 132.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.